STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Bradley J. VORBURGER, Defendant-Appellant.

Supreme Court

*No. 00–0971–CR. Oral argument November 8, 2001.—Decided July 16, 2002.*

2002 WI 105

(Also reported in 648 N.W.2d 829.)

540

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *David D. Cook,* Monroe.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals that reversed the conviction of Bradley J. Vorburger on a charge of possession of cocaine with intent to deliver, and directed the circuit court to grant Vorburger's motion to sup-

press evidence.[1] Vorburger and a co-defendant, Amerie Becker, were stopped and detained in a motel by police conducting a drug investigation. During questioning by police, Vorburger consented to a search of his car and Becker consented to a search of the apartment in which she and Vorburger resided.

¶ 2. Vorburger moved to suppress the evidence discovered by police in the car and in the apartment. He claimed that he and Becker were illegally seized and arrested and that their consents to the searches were both involuntary and the fruit of illegal seizures.

¶ 3. Vorburger's motion to suppress was denied by the Circuit Court for Dane County, Steven D. Ebert, Judge. Vorburger then pled no contest to one count of possession of cocaine with intent to deliver as party to the crime, contrary to Wis. Stat. §§ 961.41(1m)(cm)2 and 939.05 (1995–96).[2] He appealed his conviction, alleging that the circuit court erred in denying his suppression motion. The court of appeals reversed, determining that Vorburger and Becker were unlawfully arrested. The court concluded that Vorburger's consent to search his car and Becker's consent to search their apartment were given as a result of unlawful arrests and, therefore, were invalid.

¶ 4. The State petitioned this court for review of the court of appeals decision as it relates to Becker's detention and consent to search. We now determine that Becker was properly and lawfully stopped and detained as part of a law enforcement investigation and that her detention did not constitute an unlawful

---

[1] *State v. Vorburger,* 2001 WI App 43, 241 Wis. 2d 481, 624 N.W.2d 398.

[2] All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated.

arrest. We further determine that Becker voluntarily consented to the search of her apartment. Accordingly, we reverse the decision of the court of appeals.

## I. BACKGROUND

¶ 5. The facts of this case are gleaned from testimony at a motion hearing held on April 2 and 3, 1998, and from documents in the record. The salient events occurred during the afternoon and evening of July 2, 1997, and the early hours of July 3. Between 4:00 and 4:30 in the afternoon of July 2, the manager of a Motel 6 east of Madison near Interstate 90 was inspecting rooms to ensure that they had been properly cleaned. As he entered room 230, the manager detected a strong smell that he suspected was marijuana. He also noted an unzipped bag about the size of a diaper bag on the floor next to the air conditioning unit. He picked up a sample of the substance he saw in the bag, placed it in a plastic bag, took the plastic bag to the motel office, and called the police.[3]

¶ 6. Dane County Deputy Sheriffs Jeffrey Thiel and Robert Lurquin were dispatched to the motel, and arrived separately at approximately 4:30. Deputy Thiel met with the manager and examined the substance that had been removed from room 230. The substance appeared to be marijuana. The manager showed Deputy Thiel a check-in slip. It revealed that room 230 had been rented to Corin Cramer and listed the driver's license number and license plate number (RZY-670) that Cramer gave when he checked in. Deputy Thiel checked the license plate number and learned that the

___

[3] The manager testified at the motion hearing that he could not recall whether he personally called the police or whether he had an employee call them.

plates were registered to Peter Kokoros and were associated with a four-door Buick.

¶ 7. Deputies Lurquin and Thiel contacted their supervisor, Sergeant David Ritter, who contacted Sergeant Randall Gaber,[4] a supervisor with the Dane County Narcotics and Gangs Task Force (Task Force). Sergeant Gaber then contacted Detective Alix Olson of the Madison Police Department and instructed her to begin to prepare a search warrant affidavit.

¶ 8. Deputies Thiel and Lurquin then positioned themselves outside room 230 to wait for a warrant to search the room. From their vantage point, the officers could see the motel parking lot through a window. At approximately 5:45, a four-door vehicle with license plate number RZY-670 entered the parking lot. The driver parked the car and entered the motel. When the driver approached the door to room 230 and attempted to insert a key into the lock, he was approached by Deputy Thiel.

¶ 9. The driver identified himself as Peter Kokoros and acknowledged that room 230 was registered to Cory Cramer. Kokoros stated that Cramer had been in Kokoros' car that day and had left the motel room key in the car. Kokoros claimed that he found the key and stopped at the motel to use the bathroom.

¶ 10. At about 5:45 or 6:00, a number of other officers from the Task Force arrived at the motel. After leaving Kokoros with Officer Michael Montie, Deputy Thiel field-tested the contents of the plastic bag given to

---

[4] By the time of the motion hearing, Sergeant Gaber had been promoted to Lieutenant. This opinion refers to Gaber by his rank at the time of the incident.

him by the motel manager. The substance tested positive for tetrahydrocannabinols (THC), the active ingredient in marijuana.

¶ 11. Officer Montie told Kokoros that he was not under arrest but was being detained. He asked him to go outside for questioning. Kokoros told Officer Montie that he had traveled to Madison from La Crosse the previous day and had stayed in room 215 of the motel that night. He said that he had checked out at around 10:00 a.m. and had met with Cory Cramer and another friend. Kokoros told Officer Montie that he was on his way back to La Crosse when he noticed the motel key in his car and remembered Cramer saying that he was staying in room 230. Kokoros claimed that he intended to drop off the key at the residence of Cramer's girlfriend, but first went to the motel to use the bathroom. Detective Olson subsequently checked Kokoros for warrants and learned that he was on probation for a drug offense.

¶ 12. Meanwhile, Officer Kevin Linsmeier learned from the front desk clerk that room 215 had not been rented since Kokoros had checked out, so he got a key for the room. When he entered room 215, he smelled marijuana and observed particles of marijuana, marijuana seeds, and other marijuana remnants. Officer Montie learned from a motel employee that Cory Cramer had arrived at the motel at approximately 2:30 that afternoon in a car with license plate number RZY-670, and had checked into room 230. Officer Montie continued to question Kokoros[5] who told him that Cramer was likely driving a Grand Prix owned by

---

[5] Officer Montie drove his squad car in which he was questioning Kokoros across the street to act as an "early observation" vehicle and perhaps a "stop" vehicle depending on what transpired in the motel parking lot.

Cramer's girlfriend. Officer Montie called the State Patrol and learned that the car registered to Cramer's girlfriend was a Grand Prix, and that Cramer had a Madison address.

¶ 13. While Officer Montie was questioning Kokoros, Deputy Thiel, Sergeant Gaber, and Officers Linsmeier, Christian Paulson, and Linda Kosovac entered room 229 to wait for the warrant.

¶ 14. At around 9:20, Officer Montie was informed that two vehicles, one a Grand Prix, had arrived in the motel parking lot. Officer Montie drove his squad car into the parking lot and Kokoros identified one of the vehicles as the Grand Prix that Cramer had been driving. Kokoros also identified Cramer as he exited the Grand Prix. Cramer entered the motel office, told the front desk clerk that he had left his key in the room, and was given a new key.

¶ 15. A few minutes later, just after 9:20, the officers in room 229 observed three people, later identified as Cramer, Vorburger, and Becker, approach room 230. When they saw Cramer begin to insert a key into the lock, the officers exited room 229 and identified themselves as police officers. Sergeant Gaber handcuffed Cramer, and Deputy Thiel and Officer Kosovac handcuffed Vorburger. Officer Linsmeier handcuffed Becker, telling her that it was for officer safety and for her safety. Officers performed pat-down searches on Cramer, Vorburger, and Becker but found no weapons.

¶ 16. Vorburger, Cramer, and Becker were detained in the motel hallway, each separated from the others. Vorburger and Cramer were seated in chairs. Becker declined to sit.

¶ 17. Officer Linsmeier told Becker she was being detained and was not free to leave while the officers

conducted an investigation, but she was not under arrest. Becker cried and appeared to be upset. She identified herself and told Officer Linsmeier that Vorburger was her boyfriend. She explained that she was going to room 230 to use the bathroom.

¶ 18. At around 9:40, about 15 minutes after officers first detained her, Becker asked to use the bathroom. Officer Linsmeier asked a female officer, Linda Kosovac, for assistance. Officer Kosovac told Becker that she would accompany her to the bathroom, and that she could use it, so long as Officer Kosovac was present. Becker chose not to use the bathroom.[6]

¶ 19. Detective Olson completed the search warrant affidavit at approximately 8:45 and drove it to the home of Dane County Circuit Judge Angela Bartell, who reviewed the affidavit and signed a warrant at 9:34. Detective Olson brought the signed warrant directly to the motel, arriving at around 10:05. At 10:17, Detective Olson, Sergeant Gaber, and three other officers entered room 230 to execute the warrant.

---

[6] Becker and Officer Kosovac differed about Becker's request to use the bathroom. Becker acknowledged that Officer Kosovac offered to let her use the bathroom, but claimed that Officer Kosovac told her that her handcuffs could not be removed to facilitate using the bathroom. Becker asserted that she told Office Kosovac that she had recently undergone a personal medical procedure and did not want anyone to help lower her pants. Officer Kosovac testified that Becker never told her about her surgical procedure, that she never told Becker that her handcuffs could not be removed, and that handcuffs are routinely removed from females to allow them to use the bathroom.

¶ 20. Inside room 230, the officers found the bag that the motel manager had described. It contained about 14 pounds of marijuana and a digital scale. The officers also found a box containing plastic bags.

¶ 21. Just after 10:30, Detective Olson and Sergeant Gaber directed Officer Kosovac to question Becker. Officer Kosovac took Becker into room 229 and removed her handcuffs. Approximately 70 minutes had passed since Becker was initially detained. According to Becker, "It felt like hours, but I think it was about an hour and a half, two hours." Officer Kosovac told Becker that she could use the bathroom with the door slightly ajar. Becker used the bathroom and got a drink of water.

¶ 22. At 10:39, Officer Kosovac read the *Miranda*[7] warnings to Becker. She then told Becker that the investigation was a "drug" investigation, and that officers had found a large quantity of marijuana in room 230. Officer Kosovac asked Becker if she smoked marijuana. Becker replied that she and Vorburger both were occasional marijuana smokers and had shared a "blunt"[8] that afternoon at their apartment. Officer Kosovac asked whether Becker had any drugs or drug paraphernalia in her purse, and if she would consent to a search of her purse. Becker agreed and after warning Officer Kosovac that she was a diabetic and had a needle in her purse, allowed Officer Kosovac to dump the contents of her purse onto the bed. Officer Kosovac found nothing illegal. Officer Kosovac then asked Becker if she had any drugs at her apartment. Becker

---

[7] *Miranda v. Arizona,* 384 U.S. 436 (1966).

[8] A "blunt" is a hollowed-out cigar filled with marijuana. *See State v. Hughes,* 2000 WI 24, ¶ 8, 233 Wis. 2d 280, 607 N.W.2d 621.

stated that there might be a small quantity of marijuana and some rolling papers.[9]

¶ 23. Officer Kosovac asked Becker if she could remove the marijuana and rolling papers from Becker's apartment. Becker agreed. Officer Kosovac testified that she asked Becker if officers would find anything more than the small quantity of marijuana if they searched the apartment and Becker replied that they would not. She then asked Becker if officers could go to the apartment, confiscate the small amount of marijuana and paraphernalia, and search the apartment for other items of drugs or drug paraphernalia. Officer Kosovac testified that Becker replied with words to the effect of "Sure, no problem."[10]

¶ 24. Officer Kosovac testified that around 11:15 she told Sergeant Gaber and Detective Olson that Becker had given consent to search the apartment. Officer Kosovac again asked Becker if she consented to a search, and Becker responded that she did. Two uniformed officers then transported Becker to her apartment, while Officer Kosovac followed in her squad car. When they arrived, the two uniformed officers

[9] Becker testified that Officer Kosovac told her that Vorburger had informed an officer that marijuana stems and seeds were likely present in the apartment.

[10] Becker's testimony differed significantly from that of Officer Kosovac's. She claimed that Officer Kosovac asked only if officers could remove the small quantity of marijuana, but did not ask if they could search the entire apartment. She further claimed that Officer Kosovac implied that if Becker did not consent to the search, she would get a search warrant to remove the marijuana. Becker testified that she agreed to allow Officer Kosovac to remove the marijuana from the apartment because she did not want her apartment to be "trashed" in a search pursuant to a warrant.

waited, at Becker's request, for Becker to let them in the back door so that neighbors would be unaware that police officers were in the apartment. Officer Kosovac testified that before the officers began to search the apartment, she again asked Becker for consent to search, and that Becker said the officers could look wherever they wanted.[11]

¶ 25. In their search of the apartment, officers found marijuana, powder cocaine, hallucinogenic mushrooms, a small postal scale, a pager, and the remains of smoked marijuana, as well as lease and rental agreements in the names of Becker and Vorburger. They also found $1968 in cash in the pocket of a shirt hanging in the bedroom closet. The officers found two baggies of powder cocaine in a jewelry holder that belonged to Becker. Officer Kosovac testified that she asked Becker if the cocaine was hers, and Becker replied that it was not. Officer Kosovac further testified that she found a receipt with the name "Brad Vorburger" on it in the same place as the officer found the cocaine. When the officers completed the search and confiscated the drugs and drug paraphernalia, they left, allowing Becker to remain at her apartment.

¶ 26. Vorburger and Becker were each charged with possession of 15 to 40 grams of cocaine with intent to deliver, within 1000 feet of a school zone, contrary to Wis. Stat. §§ 961.41(1m)(cm)3, and 302.11; knowingly maintaining a place used for keeping controlled substances, contrary to Wis. Stat. § 961.42; knowingly pos-

---

[11] Becker testified that after Officer Kosovac saw the marijuana that Becker had told her she would find, Officer Kosovac wanted to search the rest of the apartment. Becker asserted that she did not hear Officer Kosovac ask for consent to search the entire apartment and that she did not give consent to such a search.

sessing psilocin, contrary to Wis. Stat. § 961.41(3g)(d); and two counts of knowingly possessing THC, contrary to Wis. Stat. § 961.41(3g)(e).[12]

¶ 27. Vorburger moved to suppress "all evidence obtained directly or indirectly as a result of the stop, detention and arrest ... on or about July 2–3, 1997 ...." He claimed that he and Becker were both stopped, detained, and arrested without a warrant and without reasonable suspicion that he or she had committed or were about to commit a crime. He further claimed that the consent he gave to the search of his car and the consent that Becker gave to the search of their apartment were the result of unlawful arrests and, therefore, invalid.

¶ 28. After a hearing, the circuit court denied Vorburger's motion, finding that the detentions of Becker and Vorburger were not unlawful. It determined that the tactics used by police in gaining consent to search Vorburger's car and the Becker/Vorburger apartment were not "coercive, improper, or designed to overcome the defendant's resistance." The court concluded that the voluntariness of Becker's consent was proven by clear and convincing evidence.

¶ 29. Before trial, Vorburger agreed to plead to one count of possession of more than 5 but not more than 15 grams of cocaine, contrary to Wis. Stat. §§ 961.41(1m)(cm)2, and 939.05, in exchange for a reduction in the cocaine charge from possession of more than 15 but not more than 40 grams to possession of more than 5 but not more than 15 grams, and for

---

[12] All charges filed against Vorburger and Becker were as party to the crime, pursuant to Wis. Stat. § 939.05.

dismissal of the other charges and enhancers. Vorburger was sentenced to 30 months in prison on October 4, 1999.[13]

¶ 30. Vorburger appealed, and the court of appeals reversed, concluding that Vorburger and Becker were unlawfully arrested, and that their consent to search resulted from the unlawful arrests. *State v. Vorburger*, 2001 WI App 43, 241 Wis. 2d 481, 624 N.W.2d 398. The court cited numerous factors in determining that Becker and Vorburger were arrested at the motel. It noted that the two were handcuffed and *Mirandized*, that they were not free to leave, and that Becker was questioned in a closed room. *Id.* at ¶¶ 17–18. The court determined that Vorburger and Becker consented to the searches of the car and apartment, respectively, after arrests without probable cause, rendering the consents and searches invalid. *Id.* at ¶¶ 22, 29.

¶ 31. The State petitioned this court for review, solely on the validity of the search of the apartment,[14] and we granted the petition. The primary issue in this case is whether the search of the apartment in which Becker and Vorburger resided complied with the Fourth

[13] Becker pled guilty to two counts of possession of THC contrary to Wis. Stat. § 961.41(3g)(e) and one count of possession of psilocin contrary to Wis. Stat. § 961.41(3g)(d). All the remaining charges and enhancers were dismissed. Becker was sentenced to 30 months probation on March 1, 1999.

[14] The State does not contest the court of appeals determination that the evidence of marijuana in Vorburger's car was obtained as the result of an unlawful arrest and was properly suppressed. It contests only the reversal of the conviction that was based on evidence gathered during the search of the apartment. Therefore, although this is Vorburger's appeal, our focus is on Becker's detention and her consent to search the apartment she shared with Vorburger.

554

Amendment to the United States Constitution. To decide this issue, we must determine whether Becker's detention at the motel constituted an unlawful arrest, and whether Becker voluntarily gave officers her consent to search her apartment.

## II. THE STOP AND DETENTION

A. Standard of Review

¶ 32. The constitutional validity of a search and seizure raises a question of constitutional fact. *State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. When a defendant moves to suppress evidence, the circuit court "considers the evidence, makes findings of evidentiary or historical fact, and then resolves the issue by applying constitutional principles to those historical facts." *Id.* (citing *State v. Martwick,* 2000 WI 5, ¶¶ 16–17, 231 Wis. 2d 801, 604 N.W.2d 552). We review a circuit court's denial of a motion to suppress in two steps. We examine the circuit court's findings of historical fact under the clearly erroneous standard, and then review de novo the application of constitutional principles to those facts. *State v. Eason,* 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625; *State v. Matejka,* 2001 WI 5, ¶ 16, 241 Wis. 2d 52, 621 N.W.2d 891.

B. The Circuit Court's Findings and Conclusions

¶ 33. The circuit court determined that Becker was not arrested, but was merely detained "to freeze the status quo while awaiting a search warrant, and to engage in Terry-style inquiries in the meanwhile."[15] The court reached its conclusion after it made numer-

---

[15] *Terry v. Ohio,* 392 U.S. 1 (1968).

ous findings of fact regarding the investigative detention of Becker.[16] It found that "Becker was detained for approximately one hour before the search warrant was executed, and at least two and one-quarter hours before being released." The court found that "[t]he degree of restraint was modest," noting that while the officers used handcuffs, they did not draw their guns or use any additional restraints. It found that "the police repeatedly stressed to defendants that they were not under arrest, . . . the police limited their questioning (to a scope more befitting a *Terry* stop than a custodial interrogation), and the police maintained the detention only as long as was necessary to effectuate its purpose (until they received and executed the search warrant)." Finally, the court noted that Becker was not moved out of the motel, and was not questioned in a police vehicle.

¶ 34. The court did not specifically note the number of officers present at the motel, but it determined that "the number of officers involved was appropriate for the number of defendants involved." The court considered the totality of the facts and circumstances and concluded that "the police officers' actions and words would have reasonably communicated to the defendants [] that they were not free to go, but that they were not under arrest."

¶ 35. As noted above, we review the circuit court's findings of fact under the "clearly erroneous" standard. Vorburger disputes none of the circuit court's factual findings, and our review of the record finds that each finding is supported by testimony at the preliminary hearing or motion hearing. We therefore cannot con-

---

[16] The circuit court's order denying the suppression motions applied to all four people detained at the motel—Kokoros, Cramer, Vorburger, and Becker. For the purposes of this opinion, we focus only on the findings related to Becker.

clude that any of the factual findings made by the circuit court was clearly erroneous.

¶ 36. The circuit court determined that under these facts and circumstances, Becker's detention did not constitute an illegal arrest. The court of appeals disagreed. It noted that Becker was read *Miranda* warnings in a closed-off room. Although her handcuffs had been removed, Becker had "little if any indication of how long [she] would be detained or what [she] might have to do before [she was] free to go." *Vorburger,* 2001 WI App 43, ¶¶ 17–18. The court of appeals concluded that Becker was confined and interrogated, and thus, arrested. *Id.* at ¶ 18. We review de novo the circuit court's determination that Becker was not arrested, benefiting from the analysis of the circuit court and the court of appeals.

## C. Detention or Arrest

¶ 37. The critical issue in this case is whether the detention of Amerie Becker was constitutional at the time she consented to the search of her apartment. A second issue is whether the consent she gave was voluntary.

¶ 38. The constitutionality of Becker's detention is governed by the Fourth Amendment, which protects the "right of the people to be secure in their *persons,* houses, papers, and effects, against *unreasonable* searches and *seizures . . . .*" U.S. Const. amend. IV (emphasis added). Reasonableness is the "ultimate standard" embodied in the Fourth Amendment. *See Michigan v. Summers,* 452 U.S. 692, 699 (1981). It is "the central inquiry," *Terry v. Ohio,* 392 U.S. 1, 19 (1968),

and "the key principle." *Summers,* 452 U.S. at 700 n.12 (quoting *Dunaway v. New York,* 442 U.S. 200, 219 (1979) (White, J., concurring)).

■

¶ 39. The investigative stop and detention of Becker constituted a seizure for Fourth Amendment purposes. *See Terry,* 392 U.S. at 19 n.16 (concluding that a person is seized "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen . . . ."). Consequently, the question is whether this seizure was reasonable under all the circumstances, or whether it violated the Fourth Amendment.

¶ 40. Cory Cramer, Brad Vorburger, and Amerie Becker were detained by officers of the Dane County Narcotics and Gangs Task Force at 9:20 on a Wednesday evening. Law enforcement officers were already in the process of obtaining a warrant to search room 230 of the motel. The warrant authorized a search of "said premises and persons unknown within said premises." Had Cramer, Vorburger, and Becker not been stopped at the door of room 230, they might still have been "within said premises" when the warrant was executed.

¶ 41. The police had been working on the warrant for more than four hours. Detective Olson completed her part of the paperwork about 8:45, 35 minutes before the detention began. After conferring with an assistant district attorney, she drove the warrant and the lengthy supporting affidavit to the home of Circuit Judge Angela Bartell, who read it and signed the warrant at 9:34. This was 14 minutes after commencement of the detention. Detective Olson then left and headed directly to the motel. Shortly after obtaining the warrant, she informed the Task Force that the warrant was on its way.

¶ 42. Hence, at the time Cramer, Vorburger, and Becker were detained, the Task Force officers knew that a warrant was nearly ready. They had probable cause to search room 230 and probable cause to believe that a crime had been committed, as they had tested the substance taken from the room. They were already detaining Peter Kokoros, who had appeared unexpectedly with a key to the room several hours earlier. They knew Kokoros was on probation for a drug offense, that he had stayed in room 215 the night before, and that room 215 smelled of marijuana and contained physical evidence of marijuana. They knew Kokoros had been with Cory Cramer earlier in the day and that Cramer had been using Kokoros's car when he checked into the motel at 2:30 that afternoon. Finally, they knew that during his detention, Kokoros had given the police several explanations of his activities that made them wary of his truthfulness.[17]

## 1. The Stop and Initial Detention

¶ 43. We first address the stop and initial detention. Wisconsin Stat. § 968.24 authorizes "temporary questioning without arrest." It provides:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address

---

[17] Officer Montie asked Kokoros why, if he had come to the motel at 5:45 specifically to use the bathroom—but was stopped before he could do so—he had not asked to use the bathroom by 7:45. Officer Montie later testified: "I did not believe that he had to use the bathroom at all."

of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

Wis. Stat. § 968.24.

¶ 44. Vorburger does not dispute that the Task Force officers had reasonable suspicion that Cramer had committed a crime and that Vorburger and Becker were committing, were about to commit, or had committed a crime. There clearly was reasonable suspicion that Vorburger and Becker were about to commit a crime—it was 9:20 on a Wednesday evening and they were at the door of a motel room that smelled strongly of marijuana, accompanying the person who had rented the motel room several hours earlier.

██

¶ 45. We conclude that the stop and initial detention were based on reasonable suspicion and therefore lawful. The police were entitled to demand the names and addresses of the three persons and an explanation of their conduct. They also were entitled to pat down the three suspects to assure that they were not armed. *See State v. McGill,* 2000 WI 38, ¶¶ 20, 32, 234 Wis. 2d 560, 609 N.W.2d 795.

2. Detention Before and During Execution of the Warrant

¶ 46. We next address the detention of Amerie Becker pending the arrival and during the execution of the warrant. In *Rawlings v. Kentucky,* 448 U.S. 98, 110 (1980), the Supreme Court stated that "the legality of temporarily detaining a person at the scene of suspected drug activity to secure a search warrant may be an open question." The defendant in *Rawlings* was a

visitor at a house where police smelled and observed marijuana. The Court more or less assumed that when the police detained Rawlings while they obtained a search warrant, they were violating the Fourth Amendment. *Id.* at 106. Nonetheless, the Court upheld Rawlings' conviction. *Id.* at 111.

¶ 47. In the years since 1980, there has been a clear evolution in the law. In *Summers,* the Court reviewed the case of a man who was detained as he was leaving his home and then held while the police executed a search warrant of his house. *Summers,* 452 U.S. at 693. Thereafter the man was arrested and searched. The Court said: "[F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705. The Court explained that: "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703–04.

¶ 48. Applying *Summers* to this case, it seems clear that law enforcement officers could have validly detained Cramer, the person to whom the room was registered, while the search warrant for contraband was executed. However, Vorburger attempts to distinguish the *Summers* case as applied to Becker. He contends that Becker was neither a resident nor occupant of the room. The answer to this argument is found in two federal cases, *United States v. Pace,* 898 F.2d 1218 (7th Cir. 1990), and *United States v. Fountain,* 2 F.3d 656 (6th Cir. 1993).

¶ 49. In *Pace,* the Seventh Circuit Court of Appeals applied *Summers* to a situation in which officers

561

went to a condominium to execute a search warrant for gambling records and money and found the owner and three non-residents. *Pace,* 898 F.2d at 1223. The officers patted down all four men and detained them while they searched the condominium. *Id.* Two of the nonresidents later claimed that they had been unlawfully detained during the search and, therefore, were arrested. *Id.* at 1238. They argued that *Summers* did not apply because they were not occupants or residents of the condominium. *Id.* at 1239. The court determined that *Summers* did apply because:

> While it turned out that [the two men] were not residents of [the] condominium, it is still significant that they were present in a condominium that a neutral magistrate had found probable cause to believe contained evidence of illegal gambling activities. The police officers could not be sure whether or not [the two men] were involved in the gambling, nor could they even be sure whether or not [the two men] were "occupants" of the condominium. Thus as in *Summers,* the connection of [the two men] to the condominium gave the officers "an easily identifiable and certain basis" for detaining [the two men] during the search.

*Id.*

¶ 50. Similarly, in *Fountain,* the Sixth Circuit applied *Summers* to a situation in which law enforcement officers looking for drugs executed a search warrant at a house where the owner and three other people were present. *Fountain,* 2 F.3d at 659. The officers gathered the four people they found in the house, handcuffed them, and had them lie face down on the floor. *Id.* In executing the warrant, the officers found illegal drugs. *Id.* at 660. They then questioned each of the four detainees separately. *Id.* One of the nonresident defendants moved to suppress the evidence

against him, claiming that the officers could not have detained him under *Summers* because he was not a resident of the house and was therefore not an occupant. *Id.* at 663. The *Fountain* court determined that the officers acted reasonably in detaining the defendant because his "apparently voluntary connection with the home provided the agents with 'an easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d] detention.' " *Id.* The court rejected the argument that the Supreme Court intended *Summers* to apply only to residents. *Id.*

■

¶ 51. We agree with the *Pace* and *Fountain* interpretations of *Summers*. The Task Force officers acted reasonably in detaining Becker and Vorburger even though they were not the persons to whom room 230 was registered. Becker and Vorburger voluntarily connected themselves to the motel room and its occupant. Without investigation, they could not be dismissed as innocent bystanders. There was reasonable suspicion that they were present at the motel room for criminal activity.

¶ 52. Vorburger points out that Becker was not *in* the room at the time the officers stopped her. Under the circumstances, we find this distinction meaningless. Becker was standing outside the room with the person to whom the room was registered. The registrant was putting his key in the lock. Becker was seconds away from entering the room and later admitted that she intended to enter the room. The fact that Becker and Vorburger were standing immediately outside the room when they were stopped does not destroy their required voluntary connection to the room.

¶ 53. A third distinction between this case and *Summers* is that the officers in *Summers* already had

their warrant when they detained the defendant. Here, Becker was detained before the warrant had arrived and before it was signed.

¶ 54. This concern was substantially allayed in *United States v. Ritchie,* 35 F.3d 1477 (10th Cir. 1994). An FBI agent was traveling to the defendant's home with a search warrant when the defendant began to leave the premises in an automobile. Agents on the scene detained him for about ten minutes until the arrival of the warrant. The Tenth Circuit determined that the agents on the scene were justified in stopping and detaining the defendant because they "knew that a neutral party had issued a search warrant for [the] premises, thus giving them reasonable suspicion to detain him." *Id.* at 1483.

¶ 55. The Supreme Court affirmed this principle on different facts in *Illinois v. McArthur,* 531 U.S. 326 (2001). In *McArthur,* a police officer with probable cause to believe that the defendant had marijuana in his trailer home, prevented him from entering the home unless the officers accompanied him inside. *Id.* at 329. In the meantime, another officer left to obtain a search warrant. *Id.* The Court reversed an Illinois court's suppression of the drug evidence found in the trailer. Writing for the Court, Justice Breyer explained:

> When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. . . .
>
> . . . .
>
> . . . [T]he police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. They neither searched the trailer nor

arrested McArthur before obtaining a warrant. Rather, they imposed a significantly less restrictive restraint, preventing McArthur only from entering the trailer unaccompanied. . . .

. . . [T]he police imposed the restraint for a limited period of time, namely, two hours. . . . As far as the record reveals, this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.

*Id.* at 330–32.

¶ 56. The rationale for detentions involving search warrants is fully explained in the *Summers* opinion. The Court noted the difference between the detention of Summers and the detention of a suspect on the street, à la *Terry:*

A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.

*Summers,* 452 U.S. at 701.

¶ 57. The involvement of a neutral and detached magistrate also impressed Justice Souter in the *McArthur* case. Justice Souter wrote that "the legitimacy of the decision to impound [McArthur's] dwelling follows from the law's strong preference for warrants . . . . The law can hardly raise incentives to obtain a warrant without giving the police a fair chance to take their probable cause to a magistrate and get one." *McArthur,* 531 U.S. at 338 (Souter, J., concurring).

¶ 58. The *Summers* court evaluated the law enforcement interests in the detention of Summers and found significant: (1) the law enforcement interest in "preventing flight in the event that incriminating evidence is found"; (2) the law enforcement interest in "minimizing the risk of harm to the officers"; and (3) the law enforcement interest in "the orderly completion of the search." *Id.* at 702–03.

¶ 59. The Court expanded on the second point, stating: "Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. . . . [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702.

¶ 60. The *Summers* decision provides the framework for evaluating Becker's detention pending the arrival and during the execution of the warrant for contraband.

¶ 61. Becker was detained at approximately 9:20. She and her companions were told that the officers were conducting an investigation, that the three were being detained and were not free to leave, but that they were not under arrest. The three were patted down, handcuffed, and held in the second floor corridor of a motel. All three were offered chairs. Becker declined to sit down. At one point she asked to go to the bathroom. There is a dispute about what she said and what Officer Kosovac said, but Becker did not go to the bathroom until the search warrant was executed. Her purse was not searched until later, with her consent.

¶ 62. Vorburger complains that several elements of the detention during this period were unreasonable and transformed the detention into an arrest. He argues that Becker's detention lasted for a period exceed-

ing two hours, that she was handcuffed with her hands behind her back and directed to sit in the hallway with one or more police officers continually present, and that she was not allowed to use the bathroom privately.

█

¶ 63. The circuit court found that Becker "was detained for approximately one hour before the search warrant was executed." According to the record, her detention began at 9:20; the warrant arrived at 10:05; the warrant was read to Cramer at 10:15; and the warrant was executed at 10:17. Shortly after 10:30, Becker was taken into room 229. Thus, the period of detention related to the procurement and execution of the search warrant was roughly one hour and ten minutes. This period of detention was not unreasonable given the time of day and the distance separating police headquarters, the judge's residence, and the motel, which is located in the Town of Blooming Grove, east of Monona. In Justice Breyer's words, "this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain [and execute] the warrant." *McArthur*, 531 U.S. at 332.

¶ 64. The officers handcuffed the three detainees. In analyzing this fact, the circuit court quoted *State v. Swanson*, 164 Wis. 2d 437, 448, 475 N.W.2d 148 (1991): "Many jurisdictions have recognized that the use of handcuffs does not necessarily transform an investigative stop into an arrest." Many federal courts have made similar pronouncements. *See e.g., United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1085 (9th Cir. 2000) (citing *Halvorsen v. Baird*, 146 F.3d 680, 685 (9th Cir. 1998); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995)); *Fountain*, 2 F.3d 656;

*United States v. Glenna,* 878 F.2d 967, 972 (7th Cir. 1989); *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir. 1983).

¶ 65. The Supreme Court stated in *Summers* that a warrant to search a premises for drugs "may give rise to sudden violence . . . . The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers,* 452 U.S. at 702–03 (citing 2 Wayne R. LaFave, *Search and Seizure* § 4.9 (1978)).

¶ 66. In this case, the officers' concern for their safety and the safety of others is well grounded in the record. There were three detainees at the motel. They were stopped in a second floor corridor. Cory Cramer, then 22, was 5 feet 10 inches tall and weighed 195 pounds. Police did not know then but later discovered in Cramer's car an electric weapon, which Cramer's girlfriend described as "Cory's stun gun." Vorburger, also 22, was 6 feet 10 inches tall, 265 pounds. One of the officers at the motel recognized him as having worked as a bouncer at a local nightclub. We conclude that the officers did not act unreasonably in their efforts to protect themselves, secure the site, and "preserve the status quo." *See Segura v. United States,* 468 U.S. 796, 815 (1984).

¶ 67. We also conclude that there is no merit to Vorburger's complaint about Becker's use of the bathroom. The testimony on this issue was disputed, and the circuit court did not find that the police had acted unreasonably. We agree.

¶ 68. We recognize that in *Swanson,* this court stated that we use an objective test, assessing the totality of the circumstances, to determine whether a seizure has escalated into an arrest:

> The standard generally used to determine the moment of arrest in a constitutional sense is whether a reasonable person in the defendant's position would have considered himself or herself to be "in custody," given the degree of restraint under the circumstances. The circumstances of the situation including what has been communicated by the police officers, either by their words or actions, shall be controlling under the objective test.

*Swanson,* 164 Wis. 2d at 446–47 (citations omitted).[18] The court of appeals utilized the *Swanson* language as the basis for its decision. *Vorburger,* 2001 WI App. 43, ¶¶ 14, 18.

¶ 69. We find it difficult to reconcile this *Swanson* language with the clear precedent in *Summers, McArthur, Pace, Fountain,* and *Ritchie.* The critical factor in this case—the factor that distinguishes it from *Swanson*—is the presence of a valid search warrant for contraband. The search warrant is central to this case and to our analysis because it injects an objective justification, based upon the determination of a detached magistrate, into the totality of the circumstances. In *Summers,* the Supreme Court, in effect, recognized the concept of detention incident to the execution of a valid search warrant. This limited deten-

---

[18] The "reasonable person" contemplated by the test is a reasonable innocent person in the defendant's position. *See United States v. Corral-Franco,* 848 F.2d 536, 541 (5th Cir. 1988); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 5.1(a) (3d ed. 1996).

tion is based upon the same factors—concern for the safety of officers and the possible destruction of evidence—that underlie searches incident to arrest. *See Summers,* 452 U.S. at 702; *Chimel v. California,* 395 U.S. 752, 763 (1969). We think such a concept applies to this case from the moment of initial detention to the completion of the search, because a search warrant was in the works and its execution was imminent, and because the police had articulable, reasonable suspicion for each of the people they detained. Becker and Vorburger cannot claim that their propinquity to room 230 was the result of pure coincidence.

3. Continued Detention After Execution of the Warrant

¶ 70. After 10:30, the "status quo" that the Task Force sought to preserve, changed. Amerie Becker was taken into room 229. Her handcuffs were removed and she used the bathroom. When she indicated she was thirsty, she was given a plastic cup of water. Several times throughout the evening, Becker was advised that she was not under arrest. She testified that the officer told her "over and over again that I was being detained, but I was not under arrest." Objectively, she never was "arrested" in the sense that she was taken to the police station or the jail, and she never was charged with any offense involving Cory Cramer or room 230.

¶ 71. After the warrant had been executed, Becker was given *Miranda* warnings and asked if she would answer questions. She was told that police were present at the motel on a drug investigation and that they had found drugs. Becker agreed to answer questions about the day's activities, which included sharing a "blunt" with Vorburger, and she spoke about their occasional drug use at the apartment. During this

discussion, Becker consented to a search of her purse. After police advised Becker that Vorburger had told them there were marijuana stems and buds at the apartment, she consented to a search of the apartment. Becker calculated whether consent to a search would be preferable to a search warrant, which police probably could have obtained based upon her own admissions, and she made a choice.

¶ 72. Becker never refused to answer questions, never asked for an attorney, never withdrew her consent. When she was driven to her home in Fitchburg by officers, she instructed them what door to enter so as not to attract the attention of neighbors.

¶ 73. The record indicates that Becker gave her consent to search the apartment within 40 minutes of being taken into room 229 and within 20 to 30 minutes after the onset of questioning.

¶ 74. A police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. *Terry,* 392 U.S. at 30; *United States v. Sokolow,* 490 U.S. 1, 7 (1989).

¶ 75. The length of an investigative detention is one of the factors to weigh in determining whether a lawful detention has escalated into an arrest. In *Florida v. Royer,* 460 U.S. 491, 493 (1983), two officers stopped Royer in an airport because he fit the profile of a drug courier. They asked him for identification and his airline ticket, and when he gave them his driver's license and ticket, they took him into a police interrogation room 40 feet away for questioning. *Id.* at 494.

They retrieved his luggage without consent, then searched his suitcases with consent and found drugs. *Id.* Royer's detention lasted approximately 15 minutes. *Id.* at 495:

¶ 76. The Supreme Court affirmed Royer's motion to suppress the drug evidence, concluding that, "What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." *Id.* at 503. The court noted that the officers had Royer's ticket, identification, and luggage, and that they never informed him he was free to leave. *Id.* It concluded that, "As a practical matter, Royer was under arrest." *Id.* The *Royer* court summed up the law as follows:

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Id.* at 500 (citations omitted).

¶ 77. The *Royer* decision was followed by two other airport cases, *United States v. Place,* 462 U.S. 696 (1983), and *Sokolow,* 490 U.S. 1. *Sokolow* appears to have neutralized some of the impact of *Royer's* plurality opinion as to what constitutes reasonable suspicion. *Sokolow,* 490 U.S. at 7.

572

¶ 78. All three cases are distinguishable from the facts here. First, unlike the three airport cases that involved only suspicion that the defendants were drug couriers, this case involved unquestionable evidence that someone had committed a felony. When the warrant was executed, police found approximately 14 pounds of marijuana in Cramer's room, together with a digital scale and plastic bags, evidence with all the hallmarks of major drug dealing. Second, unlike the three airport cases, this case involves a search warrant. The purpose of Becker's continued detention, after execution of the warrant, was to determine what she knew about the major felony across the hall.

¶ 79. On the one hand, Becker could have been a party to the felony, present at the motel to make a major drug purchase. On the other hand, she could have been a mere witness who could explain her presence and tell authorities what she knew about Cory Cramer. Peter Kokoros may have intended to remove all marijuana from the room when he stopped by the motel at 5:45. If he had done so, Vorburger and Becker would have had no known connection with the drugs. Police were entitled to try, in a reasonable follow-up to the search, to verify or dispel their suspicions about Becker's involvement. Becker ultimately disavowed any knowledge of the marijuana in room 230 and was never charged with any offense in connection with that room.

4. Duration of the Detention

¶ 80. While the Supreme Court determined in *Royer* that a 15-minute detention was impermissible, and in *Place* that a 90-minute detention was impermissible, it did not establish an absolute time limitation on investigative detentions. *See Royer,* 460 U.S. at 494,

573

503; *Place,* 462 U.S. at 698–99. In *United States v. Sharpe,* 470 U.S. 675 (1985), the Supreme Court explained that the focus in *Royer* was primarily on facts other than the duration of the defendant's detention—particularly the fact that the police confined the defendant in a small airport room for questioning. The court held that an investigative detention is not transformed into an arrest solely because of the length of the detention. *Id.* at 686, 688.[19]

¶ 81. The court determined that the length of the detention in that case (approximately 40 minutes) was not impermissible because it did "not involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *Id.* at 687. We reach the same conclusion in this case.[20]

¶ 82. Vorburger asserts that even if Becker's detention were permissible before the warrant was executed, her detention became an arrest when she was taken into room 229 and questioned, instead of being released. Vorburger contends that the officers found nothing in room 230 linking Becker to the drugs in the room and consequently they no longer had reasonable suspicion that she was involved in criminal activity.

---

[19] In *Illinois v. McArthur,* 531 U.S. 326, 332 (2001), the Supreme Court observed that the two-hour detention of a trailer resident while an officer awaited a search warrant was not constitutionally impermissible because the detention lasted for only a "limited period of time."

[20] The dissent argues that Becker's detention after execution of the search warrant lasted fifty minutes. Dissent at ¶ 116. The dissent fails to note that after Becker freshened up, she began answering questions immediately. She admitted her own drug use within minutes of the start of questioning. There is no evidence that she refused cooperation with Officer Kosovac.

¶ 83. We find this suggestion unpersuasive. Contraband is seldom invoiced and neatly labeled for a buyer.[21] We find more realistic the Seventh Circuit's comments in *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir. 1984), that "it strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal where that person did not have [the dealer's] utmost trust and confidence," implying that the trust and confidence was most likely based on the person's involvement in the deal. *See Pace*, 898 F.2d at 1240. Here, Cramer was escorting Becker and Vorburger into a room containing 14 pounds of pungent marijuana in open view. Police were entitled to draw reasonable inferences from these facts.

¶ 84. We agree with the State that the officers continued to have reasonable suspicion about Becker after the warrant had been executed and that it was not unreasonable to question her in light of their discoveries in room 230.

¶ 85. Becker testified at the motion hearing that she and Officer Kosovac talked in room 229 for "probably ten minutes." She stated that Officer Kosovac asked her "about the events that had preceded us coming to the hotel room," and if Becker "ever drank or used marijuana or used any other type of drugs." After Becker told Officer Kosovac about how she and Vorburger had smoked marijuana that day in their apartment, Officer Kosovac asked if officers could search the apartment.

---

[21] The dissent argues that execution of the search warrant yielded no evidence to connect Ms. Becker to the marijuana in the motel room. Dissent at ¶ 108. The dissent does not explain the kind of evidence the police would have been expected to find if Becker and Vorburger had come to the motel to purchase marijuana.

¶ 86. Vorburger correctly points out that when Becker was taken into room 229, Officer Kosovac did not inform her again that she was not under arrest. We do not believe, however, that a reasonable person in Becker's position would have believed that she had been placed under arrest when her handcuffs had been removed and she was allowed to use the bathroom. For Becker, police were deescalating the conditions of her detention.

¶ 87. Upon thorough review of the record, we determine, as the circuit court did, that the officers in this case acted reasonably in stopping and detaining Becker for questions and that the detention did not escalate into an arrest.

## III. CONSENT TO SEARCH THE APARTMENT

¶ 88. Having determined that Becker was not under arrest when she gave Officer Kosovac consent to search her apartment, we must next decide whether her consent was given voluntarily. Voluntariness of consent to search raises a mixed question of fact and law. This court reviews a circuit court's determination as to the voluntariness of consent to search in two steps, examining the circuit court's findings of fact under the clearly erroneous standard, but applying constitutional standards to those facts de novo. *State v. Phillips*, 218 Wis. 2d 180, 194–95, 577 N.W.2d 794 (1998) (citing *State v. Turner*, 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987)).

¶ 89. To determine whether consent was given voluntarily, a reviewing court must determine, under the totality of the circumstances, that the consent was

not the result of duress or coercion. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248 (1973); *Phillips,* 218 Wis. 2d at 197–98. A reviewing court considers "the circumstances surrounding the consent and the characteristics of the defendant," and determines whether the State has proven by clear and convincing evidence that the consent was voluntary. *Phillips,* 218 Wis. 2d at 197–98.

¶ 90. Vorburger raised the issue of the voluntariness of Becker's consent before the circuit court. The circuit court summarized his argument: "[he] argue[s] that her consent was tainted by the coercive nature of her detention; because the police indicated that if she didn't consent to a search, they'd obtain a search warrant and search anyway; because her blood sugar was fluctuating; and because she had recently undergone a surgical procedural and was on Tylenol with codeine." The circuit court rejected this argument, concluding:

> [T]he police tactic in question—explaining their willingness to pursue a search warrant, while suggesting the less-intrusive alternative of a consent search—is not coercive, improper, or designed to overcome the defendant's resistance. ... Finally, I do not find Becker's health issues to be of such quality as to render her unduly susceptible to police intimidation. Based on the testimony presented at the hearing, I conclude that the State has proven voluntariness by clear and convincing evidence.[22]

[22] The court of appeals did not reach the issue of voluntariness of consent because it concluded that Becker had been arrested by the time she gave her consent. *Vorburger,* 2001 WI App 43, ¶ 12 n.2. The court of appeals further concluded that the consent was not sufficiently attenuated from the arrest to render admissible the evidence obtained pursuant to the search. *Id.* at ¶ 29. Because we determine that Becker was not arrested

¶ 91. Vorburger now asserts that Becker's consent was involuntary because: (1) the police knew she was in a "vulnerable physical and emotional condition" because she was a diabetic who had recently had surgery; (2) she was upset and crying while she was handcuffed; (3) she was handcuffed for the first time and believed she was going to be taken to jail; (4) she was not advised of her right to refuse consent; and (5) officers did not present her with a written consent form.

¶ 92. We find unavailing Vorburger's assertion that Becker's consent was involuntary because the officers knew of her "vulnerable physical and emotional condition." First, the circuit court specifically stated: "I do not find Becker's health issues to be of such quality as to render her unduly susceptible to police intimidation." Second, Vorburger's assertion that Officer Kosovac knew of Becker's alleged "vulnerable physical and emotional condition" is not supported in the record.

¶ 93. Becker gave consent to search the apartment to Officer Kosovac, who testified that when she interviewed Becker in the motel, Becker did not appear to be injured, drugged, intoxicated, or disoriented. Officer Kosovac testified that she did not see Becker cry, that Becker did not appear to be emotionally distraught and that she was not visibly upset. Becker provided responsive, clear, chronologically-ordered answers to Officer Kosovac's questions. Officer Kosovac also stated that while Becker told her in room 229 that she was a

---

at the motel and that she voluntarily consented to the search, we need not reach the issue of attenuation.

diabetic,[23] she did not talk about her recent operation. Officer Kosovac asserted that: "She appeared to me to be in generally good health, and at no time did she tell me she was not feeling well or was not doing well." "Becker did not look sick or weak" and "appeared to [be] in generally good health."

¶ 94. Becker's own testimony does not contradict Officer Kosovac's version of events in any significant fashion. Becker testified that she cried four or five times while she was detained, and that she felt thirsty and disoriented due to her high blood sugar level. However, Becker's testimony at the suppression hearing puts to rest any implication that Officer Kosovac knew or should have known of Becker's alleged "vulnerable physical and emotional condition." Under cross-examination Becker acknowledged that she may not have cried while in room 229 with Officer Kosovac:

> DISTRICT ATTORNEY: And when you testified that you had cried four to five times during the course of the evening, when were you crying other than initially with Officer Linsmeier and when the cocaine was found in the bedroom [of her apartment]?
>
> BECKER: I guess I don't remember another time specifically.
>
> DISTRICT ATTORNEY: So you really could have just cried twice?
>
> BECKER: Yes.

¶ 95. Becker also acknowledged that she never told Officer Kosovac about any health problems that would affect her judgment:

---

[23] Becker told Officer Kosovac she was a diabetic so as to alert her to the needle she would find if she searched Becker's purse.

DISTRICT ATTORNEY: Did you tell her whether or not—Did you tell her you needed medicine?

BECKER: No.

DISTRICT ATTORNEY: Did you—Did you need any Tylenol III?

BECKER: I think I had just recently taken it.

DISTRICT ATTORNEY: So you didn't need any pain-killer, did you, at this time?

BECKER: I don't believe so.

DISTRICT ATTORNEY: Did you ever tell Office Kosovac anything regarding any blood sugar problems that you may be having?

BECKER: No.

■

¶ 96. Similarly unavailing is Vorburger's argument regarding Becker being upset and crying while she was handcuffed and her belief that she was going to go to jail. In considering the totality of the circumstances, we first note that Becker gave consent while she was being interviewed in room 229, after she had used the bathroom and been given a drink of water, and after Officer Kosovac had removed her handcuffs. Vorburger does not explain how Becker's emotional state *before* her handcuffs were removed is relevant to the voluntariness of her consent *after* the handcuffs were removed. Nor does he explain why Becker would have been afraid she was going to jail when she disavowed all knowledge of the marijuana in room 230.

■

¶ 97. Finally, Vorburger contends that Becker's consent was involuntary because Officer Kosovac did not provide her with a written consent form or advise

her that she was free to refuse consent. Vorburger points to no authority providing that a law enforcement officer's failure to supply a consent form to a person who gives consent to a search renders the consent involuntary. The State does not dispute that Officer Kosovac neither informed Becker that she could refuse to consent to the search of her apartment nor supplied her with a written consent form. It instead asserts, "there is no basis for finding a consent involuntary just because the police do not offer the suspect a consent form."

¶ 98. The Supreme Court addressed the issue of whether officers must inform a defendant that the defendant is "free to go" in *Ohio v. Robinette,* 519 U.S. 33, 34 (1996). The court held that "The Fourth Amendment does not require that a lawfully seized defendant be advised that he is 'free to go' before his consent to search will be recognized as voluntary." Similarly, in *Phillips,* 218 Wis. 2d at 203, this court stated that the failure of law enforcement officers to inform a defendant that he could refuse to consent to a search "weighs against, but is not fatal to, a determination of voluntary consent."

¶ 99. Officer Kosovac acknowledged in her testimony that she "probably" did not inform Becker that she could refuse to consent and did not supply her with a written consent form. Becker's testimony made clear, however, that she understood that she could refuse to consent. Becker stated that she thought she did not have "an appealing choice." The implication of Becker's statement is that she understood that she had two choices—consent to the search or refuse to give con-

sent.[24] There is nothing in the record indicating that Becker would not have consented to the search if Officer Kosovac had told her that she could refuse to give consent or supplied her with a consent form. More importantly, there is nothing in the record indicating Becker did not actually understand that she could refuse to consent. We note that Becker cooperated with Officer Kosovac after receiving *Miranda* warnings.

¶ 100. While Officer Kosovac's failure to inform Becker that she could refuse to consent to a search "weighs against . . . a determination of voluntary consent," *see id.,* we cannot conclude under the circumstances of this case that it renders Becker's consent involuntary.

¶ 101. For these reasons, we affirm the circuit court's conclusion that "the State has proven voluntariness by clear and convincing evidence."

## IV. CONCLUSION

¶ 102. For the reasons stated above, we conclude that Amerie Becker was validly detained in the motel and was not arrested. She was stopped initially upon reasonable suspicion that she was involved in a drug deal and constitutionally detained during the procurement and execution of a valid search warrant for

---

[24] Becker testified in the suppression motion hearing to her belief that had she refused to give consent, the officers would have sought a search warrant to search the apartment, and they would have "trashed" her apartment in executing the warrant. The circuit court concluded that "the police tactic in question— explaining their willingness to pursue a search warrant, while suggesting the less-intrusive alternative of a consent search—is not coercive, improper, or designed to overcome the defendant's resistance."

contraband. After the search warrant was executed, Becker was detained for a reasonable time under reasonable conditions for questioning to verify or dispel suspicion about her involvement in an established felony. We further conclude that Becker voluntarily consented to the search of the apartment in which she and Bradley Vorburger resided. We conclude, therefore, that the circuit court properly denied Vorburger's motion to suppress. Accordingly, we reverse the decision of the court of appeals reversing the circuit court's order.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 103. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting).* The issue in the present case is whether Ms. Becker's detention following the execution of the search warrant was an unlawful seizure. I conclude it was. Therefore, Ms. Becker's consent to search the apartment she and Vorburger shared, given during her detention, was invalid.

¶ 104. This case does not involve, as the majority opinion would have you believe, the legality of Ms. Becker's detention while waiting for the search warrant and its execution. The majority opinion emphasizes at length the period of detention that occurred *before* execution of the search warrant. It buries within the depths of the opinion the whole body of law that governs unlawful detentions that are not connected with the execution of a search warrant.

¶ 105. Ms. Becker's treatment before the search warrant was executed does color whether Ms. Becker's detention after the search warrant was executed became an unlawful arrest. But Ms. Becker's detention before and her detention after the search warrant was executed are, as the majority opinion reluctantly recog-

583

nizes, two separate events for the purposes of our analysis. *See* majority op. at ¶¶ 70–72, 84–87.

¶ 106. Let me agree for the purposes of this dissent that the initial stop of Ms. Becker at 9:20 p.m. was based on reasonable suspicion and lawful, although the State concedes that no probable cause existed to arrest Ms. Becker.

¶ 107. The majority opinion relies on *Michigan v. Summers,* 452 U.S. 692 (1981), to hold that Ms. Becker could be lawfully detained while the search warrant for contraband was executed. For purposes of this dissent, I am willing to agree with this conclusion.[1] Once the search warrant was executed, however, *Summers* and its progeny[2] become irrelevant, because *Summers* applies to a detention only until a search warrant is executed.[3] *See* majority op. at ¶¶ 47–60, 69.

¶ 108. The execution of the search warrant yielded no evidence to connect Ms. Becker to the marijuana in the motel room.[4] Any reasonable suspicion that Ms. Becker was more closely linked to the motel room and its contents other than her presence at the door was dispelled at that time. Nevertheless, the police continued to detain Ms. Becker after the search warrant had been executed.

---

[1] Majority op. at ¶¶ 45–69.

[2] *Illinois v. McArthur,* 531 U.S. 326 (2001); *United States v. Fountain,* 2 F.3d 656 (6th Cir. 1993); *United States v. Pace,* 898 F.2d 1218 (7th Cir. 1990).

[3] *Michigan v. Summers,* 452 U.S. 692, 705 (1981).

[4] *See* Officer Gaber's testimony at suppression hearing, Record at 59:62; Officer Olsen at suppression hearing, Record at 59:73.

¶ 109. As the majority opinion explains, the status quo changed after the warrant was executed.[5] At this time the law enforcement officers began "a second detention," an investigative detention. One of the officers moved Ms. Becker into a different motel room and began interrogating her.

¶ 110. An investigative detention must be based on reasonable suspicion of criminal activity supported by articulable facts.[6] On review of the record, I could not find that any of the police officers articulated any reason for detaining or questioning Ms. Becker. The majority opinion claims that Ms. Becker was detained for questioning as a potential witness.[7] However, there is no support for this claim in the record.

¶ 111. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[8] The detention should be no longer than necessary to dispel or verify the officer's suspicion, that is, no longer than necessary to determine whether Ms. Becker had any knowledge about, or connection with, the drugs in the motel room.[9] Unless a person who is detained and questioned provides answers that give the police probable cause to arrest that person, she must be released.[10] The State concedes it

---

[5] Majority op. at ¶ 70.

[6] *United States v. Sokolow,* 490 U.S. 1, 7 (1989).

[7] Majority op. at ¶ 79.

[8] *Florida v. Royer,* 460 U.S. 491, 500 (1983). *See also Terry v. Ohio,* 392 U.S. 1, 30–31 (1968); *Illinois v. McArthur,* 531 U.S. 326, 330–32 (2001).

[9] The police knew there was marijuana in the motel room at the time of Becker's initial detention.

[10] *United States v. Fountain,* 2 F.3d 656, 664–65 (1993) (citing *Berkemer v. McCarty,* 468 U.S. 420, 439–40 (1984)).

never had probable cause to arrest Ms. Becker either before or after executing the search warrant.

¶ 112. I now apply the following legal standard that the majority opinion at ¶ 86 and the State use to determine whether the facts in the present case constitute a lawful detention or an illegal seizure or arrest after the search warrant was executed: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[11]

¶ 113. In the present case, a reasonable person in Ms. Becker's position would have considered herself arrested after the search warrant was executed. Ms. Becker arrived at the motel room at 9:20 p.m., at which time she and her companions were intercepted by at least seven police officers, were placed in handcuffs, patted down for the presence of weapons or contraband, and separated from each other. While waiting for a search warrant to arrive and to be executed, Ms. Becker was not permitted to use the bathroom without supervision by a police officer and remained handcuffed for about an hour. Ms. Becker was told repeatedly before the search warrant was executed that she was not under arrest, but merely being detained.

¶ 114. After the execution of the warrant, a police officer escorted Ms. Becker into a different motel room for the purpose of interrogating her. After the search warrant was executed the police officer no longer told Ms. Becker that she was not under arrest. Indeed, shortly after escorting her into the motel room for

---

[11] *United States v. Mendenhall,* 446 U.S. 544, 554 (1980), *quoted with approval and applied in State v. Williams,* 2002 WI 94, ¶ 23, 255 Wis. 2d 1, 646 N.W.2d 834. *See also State v. Swanson,* 164 Wis. 2d 437, 446–47, 475 N.W.2d 148 (1991).

interrogation, a police officer read Ms. Becker the *Miranda* warnings. We can assume that a reasonable person has at least a casual familiarity with television crime programs (a critical aspect of our national culture) and would conclude from the *Miranda* warnings that he or she was under arrest.[12]

¶ 115. Immediately upon questioning, Ms. Becker denied any knowledge about the drugs. She was not then or at any time charged with any offense in connection with the marijuana in the motel. After she denied any involvement in the crime being investigated, the police officer did not release her, but broadened the scope of the interrogation to include subjects other than the marijuana in the hotel.

¶ 116. The detention after the execution of the search warrant lasted fifty minutes. The length of the investigative detention is one factor to weigh in determining whether a lawful detention has escalated into arrest. For example, in *Florida v. Royer,* 460 U.S. 491, 502, (1983), the U.S. Supreme Court held that a fifteen-minute investigative detention at an airport was impermissible.

¶ 117. In addition to the length of the investigation, we must examine how Ms. Becker was treated. Ms. Becker clearly was treated as if she were in police custody. Before the search warrant was executed, Ms. Becker was kept in handcuffs but was repeatedly told she was not under arrest. Shortly after execution of the search warrant, the police officer removed her handcuffs, but did not tell her she was not under arrest.

---

[12] "A classic example of the law bite in operation are reports of motorists arrested by Canadian police who repeatedly insisted that the Miranda rights be read to them." J.M. Balkin, *What Is a Post Modern Constitutionalism?,* 90 Mich. L. Rev. 1966, 1981 (1992).

After execution of the search warrant, the police officer allowed Ms. Becker to use the bathroom without an officer present, but the officer required that the bathroom door be left slightly ajar. The officer did not tell Ms. Becker that she was free to leave. The officer apparently believed Ms. Becker was in custody after the search warrant was executed because the officer gave Ms. Becker *Miranda* warnings.

¶ 118. It is only by using a legal fiction that anyone can say with a straight face that a reasonable person under the circumstances of this case would not have thought she was under arrest.[13]

¶ 119. For the reasons set forth, I dissent.

¶ 120. I am authorized to state that Justices WILLIAM A. BABLITCH and ANN WALSH BRADLEY join this opinion.

[13] *See State v. Williams,* 2002 WI 94, ¶¶ 41–44, 255 Wis. 2d 1, 646 N.W.2d 834 (Abrahamson, C.J., dissenting).