STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael D. SYKES, Defendant-Appellant-Petitioner.†

Supreme Court

*No. 2003AP1234–CR. Oral argument November 12, 2004.— Decided April 22, 2005.*

2005 WI 48

(Also reported in 695 N.W.2d 277.)

† Motion for Reconsideration denied 6-23-2005.

For the defendant-appellant-petitioner there were briefs by *Jeffrey J. De La Rosa* and *Seymour, Kremer, Nommensen, Morrissy & Koch, L.L.P.,* Elkhorn, and oral argument by *Jeffrey J. De La Rosa.*

For the plaintiff-respondent the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. Michael D. Sykes requests review of an unpublished decision of the court of appeals. The court of appeals affirmed an order of the circuit court for Washington County, Judge David C. Resheske, presiding, that denied his motion to suppress evidence of drug-related offenses. Sykes argues that his wallet was searched in violation of the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitu-

tion because the officer did not have probable cause to arrest him for the drug-related offenses prior to the search.

¶ 2. We conclude that the officer had probable cause to arrest Sykes for criminal trespass prior to the search of Sykes's wallet. We also conclude that whether the officer intended to arrest Sykes for criminal trespass prior to the search, or whether Sykes was actually arrested for and charged with criminal trespass, are not dispositive of whether the search was lawful. Rather, the search was lawful because law enforcement had probable cause to arrest Sykes for a crime prior to the search and also arrested Sykes immediately after the search, although for a different crime. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 3. Sykes was charged with possession of cocaine with intent to deliver, second or subsequent offense, contrary to Wis. Stat. §§ 961.41(1m)(cm)3 and 961.48(1) (2001–02).[1] Sykes moved to suppress the evidence.

¶ 4. His arrest arose out of a search that was conducted in the apartment of Stacy Hudson. At the hearing on Sykes's suppression motion, Hudson, William Downham, Officer Kenneth Kluck and Lieutenant Thomas Horvath testified. Hudson said she had leased an apartment in a building owned by Downham in Hartford, Wisconsin, but that she frequently stayed with friends and relatives rather than in her apartment. On one occasion when Hudson returned to her apartment, she found Sykes and his girlfriend inside. She said that Sykes refused to leave, that she never

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

gave him permission to stay in her apartment, and that she did not want him living there.

¶ 5. Downham said that he learned there were people in the apartment whom Hudson did not want there and also that there was suspicious activity in the apartment, so he obtained Hudson's permission to enter the apartment and change the locks. At Downham's request, Kluck went to the apartment with Downham and a locksmith.

¶ 6. Kluck had been sent by Horvath, then a patrol sergeant. Horvath said he knew that Downham had requested law enforcement presence during the change of the apartment's locks for security reasons. Horvath also knew, and had informed Kluck, that unwanted individuals may be in the apartment and that if that was the case, Kluck should contact Horvath for more officers.

¶ 7. When Kluck and Downham knocked on the door, no one answered. When the locksmith started attempting to open the locks, a woman opened the door from the inside. When Kluck asked her what she was doing there, she tried closing the door, but Kluck had put his foot in the doorway to prevent the door's closing. The woman continued to push against the door, asking Kluck to wait because "her man was naked." Kluck responded, "That's all right, I have seen naked men before." She then ran down the hall of the apartment and entered the bathroom.

¶ 8. When Kluck entered the apartment, he found several other people in the living room, and he called for additional officers to assist him. Kluck directed the woman who answered the door and Sykes to sit down. After Horvath and another officer arrived at the apartment, Horvath asked Sykes for identification.

¶ 9. Horvath testified that he sought to obtain Sykes's identification as follows:

A I asked Mr. Sykes if he had any identification, he said not on him but he had it in his wallet. I then asked where his wallet was.

Q What happened then?

A He advised me that it was laying in the living room area underneath a, I believe it was a cedar chest, that was up on legs so there was a space underneath it, and pointed that his wallet was laying right there.[2]

Q What did you do?

A I went and got the wallet where he advised me that it was. I double checked and said, "Is this your wallet," and he said it was. And I double checked, asked if the identification was in the wallet, he said it was.

Q What happened then?

A I opened the wallet to look for identification, and immediately found a baggie that I pulled out that I believed to be crack cocaine.

Q Was the license also in there?

A Yes, it was.

Horvath then placed Sykes under arrest. Pursuant to consent from Hudson, a full search of the apartment was then conducted and more controlled substances were found.

---

[2] On cross-examination, Horvath clarified, "I asked him where his wallet was located, and he advised me that—I think he just nodded with his head and pointed to the area of the living room where the cedar chest was."

¶ 10. In an oral decision, the circuit court decided that

the search of Sykes's wallet was lawful:

> Horvath . . . was making in my judgment an investigatory stop per se or, pat down, which he had a right to do under the circumstances to obtain the identity of the people in the apartment. The only reason he went to the item on the floor, the wallet, was because he was directed there by the Defendant in response to the question: Do you have any identification. He is entitled to ask for identification.
>
> I think the items located within the wallet were located, in effect, in plain view while the officer was attempting to ascertain the identity of the Defendant, which he had lawful reason to do.

After pleading guilty to amended charges, Sykes appealed the circuit court's decision. The court of appeals affirmed, concluding that the search of Sykes's wallet was a reasonable search incident to a lawful arrest.

¶ 11. Sykes then petitioned this court for review, which we granted. Sykes asks us to review whether a search incident to arrest is lawful where there is probable cause to arrest for a crime, a search is conducted prior to that arrest, and the suspect is then immediately arrested and charged only with offenses based on evidence seized during the search.

## II. DISCUSSION

A. Standard of Review

██

¶ 12. In reviewing the denial of a motion to suppress evidence, we will uphold a circuit court's findings of historical fact unless they are clearly erroneous. *State*

*v. Vorburger,* 2002 WI 105, ¶ 32, 255 Wis. 2d 537, 648 N.W.2d 829. However, we review de novo the circuit court's application of constitutional principles to those facts. *Id.*

B. Search Incident to a Lawful Arrest

¶ 13. The constitutional provisions cited by Sykes, the Fourth Amendment to the United States Constitution[3] and Article I, Section 11 of the Wisconsin Constitution,[4] provide protection from unreasonable searches and seizures. *State v. Pallone,* 2000 WI 77, ¶ 28, 236 Wis. 2d 162, 613 N.W.2d 568. These provisions' purpose is to safeguard individuals' privacy and security against arbitrary governmental invasions, which requires striking a balance between the intrusion on an individual's privacy and the government's promotion of its legitimate interests. *State v. Murdock,* 155 Wis. 2d 217, 227, 455 N.W.2d 618 (1990) (citations omitted). Historically, we follow the United States Supreme Court's interpretations when construing both constitutions' search and seizure provisions. *Id.*

___

[3] The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[4] Article I, Section 11 of the Wisconsin Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

¶ 14. As discussed in *Chimel v. California,* 395 U.S. 752, 762–63 (1969), a warrantless search of a person incident to a lawful arrest does not violate constitutional search and seizure provisions. *See also Murdock,* 155 Wis. 2d at 228. " 'A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.' " *State v. Fry,* 131 Wis. 2d 153, 169, 388 N.W.2d 565 (1986) (quoting *United States v. Robinson,* 414 U.S. 218, 235 (1973)).

¶ 15. A *Chimel* search incident to arrest must be contemporaneous to the arrest. *Murdock,* 155 Wis. 2d at 236. However, in *Rawlings v. Kentucky,* 448 U.S. 98, 111 (1980), the Supreme Court explained that where a "formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."[5] *Accord State v. Mata,* 230 Wis. 2d 567, 574, 602 N.W.2d 158 (Ct. App. 1999) (citations omitted); *see generally* 3 Wayne R. LaFave, *Search and Seizure* § 5.4(a) (4th ed. 2004) (describing the evolution of the "search for evidence prior to arrest" case law). Therefore, "[a] search may be incident to a subsequent arrest if the officers have probable cause to arrest before the search." *State v. Kiekhefer,* 212 Wis. 2d 460, 484, 569 N.W.2d 316 (Ct. App. 1997) (citing *Rawlings,* 448 U.S. at 111).

---

[5] In *Rawlings v. Kentucky,* 448 U.S. 98, 111 (1980), Rawlings acknowledged ownership of drugs that were in the purse of another, thereby giving police probable cause to arrest him prior to searching him.

¶ 16. The Court in *Rawlings* further explained that probable cause to arrest must have existed independent of the fruits of the search of the suspect's person. *Rawlings,* 448 U.S. at 111 & n.6; *see also* LaFave, *supra,* § 5.4(a). As the court of appeals has said, "A search may immediately precede a formal arrest so long as the fruits of the search are not necessary to support the arrest." *Mata,* 230 Wis. 2d at 574 (citation omitted). Accordingly, when a suspect is arrested subsequent to a search, the legality of the search is established by the officer's possession, before the search, of facts sufficient to establish probable cause to arrest followed by a contemporaneous arrest. *See id.; Kiekhefer,* 212 Wis. 2d at 484; *see also Rawlings,* 448 U.S. at 111.

¶ 17. In the present case, the officers had probable cause to arrest Sykes for criminal trespass before initiating the search. Pursuant to Wis. Stat. § 943.14, "[w]hoever intentionally enters the dwelling of another without the consent of some person lawfully upon the premises, upon circumstances tending to create or provoke a breach of the peace," commits criminal trespass to a dwelling. The phrase "breach of the peace," as used in Wis. Stat. § 943.14, "need only be such as to put the victim in fear of bodily harm or otherwise disturb or disrupt the peace and sanctity of the home." *State v. Von Loh,* 157 Wis. 2d 91, 99, 458 N.W.2d 556 (Ct. App. 1990).

¶ 18. There is probable cause to arrest "when the totality of the circumstances within that officer's knowledge at the time of the arrest would lead a reasonable police officer to believe that the defendant probably committed a crime. . . . The objective facts before the police officer need only lead to the conclusion

753

that guilt is more than a possibility." *State v. Cash,* 2004 WI App 63, ¶ 24, 271 Wis. 2d 451, 677 N.W.2d 709 (citations omitted); *accord Leroux v. State,* 58 Wis. 2d 671, 683–84, 207 N.W.2d 589 (1973).

¶ 19. Here, Horvath knew before he searched Sykes's wallet that the apartment was rented to Hudson, that she was not present, that unwanted individuals had been in the apartment and that they would not leave when asked. He also knew that the landlord had requested police assistance during the change of the locks due to safety concerns. Based on these facts, it would be reasonable for a police officer to conclude first, that Sykes was in the apartment without permission and second, that Sykes had generated a certain amount of fear in Downham, or at least disrupted the sanctity of Hudson's home. Horvath thus had probable cause to arrest Sykes for committing criminal trespass of Hudson's dwelling.

■

¶ 20. The scope of a search incident to arrest is confined to "the area from within which [the suspect] might gain possession of a weapon or destructible evidence," *Chimel,* 395 U.S. at 763; *accord United States v. Jackson,* 576 F.2d 749, 753 (8th Cir. 1978) (referring to this area as the suspect's "wing-span"). We have understood this to mean the area immediately surrounding the arrestee. *Murdock,* 155 Wis. 2d at 231.

■

¶ 21. Sykes has not asserted that the search of his wallet exceeded the area that may be searched incident to a lawful arrest.[6] We note that the officers testified

---

[6] The dissent says that we are shifting the burden to Sykes to prove the search was lawful. Dissent, ¶ 45. However, an unargued issue generally is not raised by this court sua sponte

that prior to the search, Kluck had directed Sykes to sit in the living room; that when Horvath asked Sykes where his wallet was located, Sykes nodded and pointed under a cedar chest located in the living room; and that the officers retrieved the wallet from under that cedar chest.[7] For the purposes of the present discussion, it is

and then decided, because neither party will have had the opportunity to brief or argue it. *See A.O. Smith Corp. v. Allstate Ins. Cos.,* 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998). Additionally, when an issue is not raised in the circuit court, but is raised here, we have concluded that the issue is waived. *State v. Caban,* 210 Wis. 2d 597, 604–05, 563 N.W.2d 501 (1997) (holding that the issue of whether there was probable cause to conduct an auto search was waived because it was not raised until appeal). Accordingly, precedent does not support the dissent's assertion that by our not picking up an issue that was not presented to us, we have shifted the burden to prove the search was lawful to Sykes.

[7] The State argues that by this conduct Sykes consented to the search. The Fourth Amendment is not violated by a warrantless search where consent to search is freely and voluntarily given. *State v. Phillips,* 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998) (citation omitted). "The State bears 'the burden of proving by clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied.' " *State v. Johnson,* 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Ct. App. 1993) (quoting *Gautreaux v. State,* 52 Wis. 2d 489, 492, 190 N.W.2d 542 (1971)). However, whether an individual has given consent is a question of fact, so we "uphold the trial court's finding on this issue unless it is against the great weight and clear preponderance of the evidence." *State v. Tomlinson,* 2002 WI 91, ¶ 36, 254 Wis. 2d 502, 648 N.W.2d 367. Here, the circuit court did not make a finding as to whether Sykes consented to the search, so there is no finding of fact for us to review. We decline to consider the issue further, as it is outside the scope of the review we granted and its resolution is not necessary in light of our decision that the present search was lawful as a search incident to arrest. For

reasonable to infer from these facts, together with Sykes's apparent concession, that law enforcement's search was confined to the area immediately surrounding Sykes. Therefore, it was within the physical area for a lawful search incident to arrest. *See Murdock,* 155 Wis. 2d at 231.

¶ 22. In sum, Horvath's search of Sykes's wallet was a valid *Chimel* search incident to arrest. Horvath had probable cause to arrest Sykes for criminal trespass before the search was conducted and independent of the fruits of the search. Immediately after the search, Horvath did arrest Sykes. That the arrest led to drug-related charges being filed, not to a charge for criminal trespass, does not negate that probable cause to arrest existed prior to the search.

¶ 23. Sykes argues that pursuant to *State v. Swanson,* 164 Wis. 2d 437, 475 N.W.2d 148 (1991), the search in question here would have been valid as a search incident to arrest only if the law enforcement personnel had subjectively intended to arrest him for criminal trespass before conducting the search and if, after the search, he had actually been arrested for criminal trespass. In *Swanson,* a law enforcement officer conducted a pat down search of Swanson after observing Swanson's vehicle nearly hit a pedestrian while driving on the sidewalk at about 2:00 a.m. and after detecting an odor of intoxicants on Swanson's breath. *Swanson,* 164 Wis. 2d at 442. In the course of that search, the officer discovered and seized a bag of

the same reasons, we do not address Sykes's arguments as to whether the challenged search was a lawful "pat down," whether the seizure in question was lawful because the contraband was in "plain view," or whether the search was lawful as an "identification search."

marijuana in Swanson's pocket and then arrested him. *Id.* He was charged with possession of a controlled substance, but he was not charged with reckless endangerment or drunk driving. *Id.* at 443, 453. We decided that the search was not a valid search incident to arrest. *Id.* at 450–55.

¶ 24. *Swanson* does not control the present case. In *Swanson,* while noting that it was not necessary to address whether probable cause existed to arrest Swanson for another offense, *id.* at 453, we explained that the facts known to the officer established only a reasonable suspicion that Swanson had committed either operating under the influence or reckless endangerment, but without more, those facts did not provide a basis for probable cause to arrest for either crime, *id.* at 453 n.6. Therefore, in *Swanson,* the only crime for which the officers had probable cause to arrest was the drug charge, an arrest based on evidence seized during the search. However, in the present case, as explained above, Horvath had probable cause to arrest Sykes for criminal trespass *before* the search and *independent of* the fruits of the search.

¶ 25. The *Swanson* decision's requirement that "the State show that an arrest actually took place for something other than possession of a controlled substance" was meant to "ensure that the police do not arbitrarily violate an individual's privacy." *Id.* at 452. The *Swanson* decision expressed concern that an individual's privacy could be invaded arbitrarily if police were allowed "to justify searches in the hope that the search would uncover something they could pursue." *Id.* at 453. However, where a law enforcement officer has probable cause to arrest before a search is undertaken, as Horvath had probable cause to arrest Sykes for criminal trespass, this concern is not implicated. Hor-

vath did not need to search Sykes in hopes that he would "uncover something" to pursue. He already had "something" to pursue: criminal trespass.

¶ 26. Similarly, the State here is not requesting that we "carve out an exception to warrantless searches based solely on probable cause with no resulting arrest," as we declined to do in *Swanson*. *Id.* at 453. In the present case, there was both probable cause before the search and an arrest immediately after the search. Accordingly, we reaffirm our statement in *Swanson*, that "[t]he actual making of a formal arrest . . . is . . . a significant event." *Id.* at 451. It is the arrest immediately following the search, along with the probable cause to arrest before the search, that causes the search to be lawful. *Mata*, 230 Wis. 2d at 574; *Kiekhefer*, 212 Wis. 2d at 484; *see also Rawlings*, 448 U.S. at 111; *Robinson*, 414 U.S. at 235.

¶ 27. Sykes contends the search at issue here was not lawful because the crime he was arrested for immediately after the search was different than the crime for which the officer had probable cause to arrest before the search. However, as long as there was probable cause to arrest before the search, no additional protection from government intrusion is afforded by requiring that persons be arrested for and charged with the same crime as that for which probable cause initially existed. To conclude otherwise would put form over substance because Sykes could have been arrested for both criminal trespass and the drug-related offenses; the district attorney could have decided to prosecute only the drug-related offense, and Sykes would be in the same position as he is in now. The intrusion on his privacy would have been no different. Accordingly, we withdraw any language from *Swanson*

that could be interpreted to limit the lawfulness of the search to requiring an arrest for the same crime for which probable cause existed prior to the search.

¶ 28. As to the officer's subjective motivations for initiating the search, Sykes argues that the officers were in Hudson's apartment in a "community caretaker capacity" or "peacekeeping function," rather than in a "criminal investigative capacity," and because of their reason for being present, they did not intend to arrest Sykes until contraband was found in his wallet. Sykes further argues that Kluck's and Horvath's conduct did not provide any indication that Sykes was going to be arrested until the drugs were found in his wallet.

¶ 29. We note that characterizing law enforcement's presence during the changing of the locks as a "community caretaking/peacekeeping" function does not preclude an officer, once he has probable cause to arrest, from acting accordingly. Additionally, in *Whren v. United States,* 517 U.S. 806, 813 (1996), the Supreme Court explained that it was "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Accord Arkansas v. Sullivan,* 532 U.S. 769, 771 (2001) (quoting *Whren* to articulate the same principle); *Mata,* 230 Wis. 2d at 574 (stating that a court is "not bound by an officer's subjective reasons for a search or arrest"); *see also State v. McGill,* 2000 WI 38, ¶ 23, 234 Wis. 2d 560, 609 N.W.2d 795 (deciding that as to a protective frisk, an objective standard should apply to determine the reasonableness of the search); *State v. Baudhuin,* 141 Wis. 2d 642, 650–51, 416 N.W.2d 60 (1987) (deciding that the lawfulness of a vehicle stop depended on the objective facts observed by the officer, not the officer's subjective intent). Similarly, the Supreme Court re-

cently stated in *Devenpeck v. Alford,* 125 S. Ct. 588, 594 (2004), " '[T]he fact that the officer does not have the state of mind [that] is hypothecated by the reasons [that] provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " (Quoting *Whren,* 517 U.S. at 813.) In *Devenpeck,* the Court further recognized that the application of objective standards, rather than standards that depend on the officer's subjective state of mind, promotes evenhanded law enforcement. *Id.* (citation omitted).

¶ 30. The court of appeals' reasoning in *Mata* is consistent with that of the Supreme Court. In *Mata,* the court determined that the search being challenged was a search incident to arrest, regardless of the fact that the search, as here, preceded the arrest. *Mata,* 230 Wis. 2d at 574. The officer who arrested Mata stated a basis for the search that the court concluded was not sufficient. *Id.* However, because the officer was aware of objective facts that were sufficient to establish probable cause to arrest and the search was conducted incident to an arrest, the court of appeals upheld the search. *Id.* It explained that "the law provides" that the search was lawful, regardless of the officer's subjective reasons for conducting the search. *Id.*

¶ 31. Similarly here, whether law enforcement subjectively intended to arrest Sykes for criminal trespass is not the relevant inquiry. Because an analysis of probable cause to arrest turns on the objective facts known to the officer, *Cash,* 271 Wis. 2d 451, ¶ 24, the relevant inquiry is whether the officer was aware of sufficient objective facts to establish probable cause to

arrest before the search was conducted, as well as whether an actual arrest was made contemporaneously with the search.

¶ 32. Sykes also relies on *State v. Hart,* 2001 WI App 283, ¶ 10, 249 Wis. 2d 329, 639 N.W.2d 213, for the principle that, contrary to *Mata*'s holding, "[t]he subjective intent of the police officer as a reasonable person would understand it is the driving force in these situations." In *Hart,* a police officer pulled Hart over for drunk driving, administered a breath test to establish that Hart was intoxicated, and decided to drive Hart to the police station, rather than arrest him, so Hart could arrange for a ride home. *Hart,* 249 Wis. 2d 329, ¶ 2. The officer told Hart that he was not under arrest and that he would be allowed to go home once he had arranged for someone to drive him. *Id.,* ¶ 7. The department had a policy that officers do a protective search prior to transporting a citizen in a squad car. *Id.,* ¶ 2. During that search, the officer discovered a marijuana pipe and arrested Hart for possession of drug paraphernalia. *Id.*

¶ 33. The court in *Hart* distinguished the *Mata* decision, explaining that

> from the moment he had probable cause, the officer in *Mata* conducted himself the way a reasonable officer would in the course of making an arrest . . . . In our case, unlike in *Mata,* the officer was entitled to make an arrest but chose not to; therefore, it was no longer reasonable to conduct himself as if an arrest was imminent.

*Id.,* ¶ 10 n.5. However, that rationale is inconsistent with opinions of the United States Supreme Court and those of this court that have explained that the subjective intent of the officer (except for the facts that he knows) is not determinative of whether the search

violates constitutional principles that prohibit unreasonable searches and seizures. *Devenpeck,* 125 S. Ct. at 594; *Sullivan,* 532 U.S. at 771; *Whren,* 517 U.S. at 813; *McGill,* 234 Wis. 2d 560, ¶ 23. We therefore conclude that the reasoning of *Mata,* not that of *Hart,* provides guidance for our decision. Any discussion in *Hart* that could be interpreted to invalidate a search incident to an arrest for which arrest the officer has probable cause is overruled.

### III. CONCLUSION

¶ 34. We conclude that the officer had probable cause to arrest Sykes for criminal trespass prior to the search of Sykes's wallet. We also conclude that whether the officer intended to arrest Sykes for criminal trespass prior to the search, or whether Sykes was actually arrested for and charged with criminal trespass, are not dispositive of whether the search was lawful. Rather, the search was lawful because law enforcement had probable cause to arrest Sykes for a crime prior to the search and also arrested Sykes immediately after the search, although for a different crime.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 35. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The majority opinion holds that the search leading to the recovery of the defendant's wallet was a valid *Chimel* search. Majority op., ¶ 22. *See Chimel v. California,* 395 U.S. 752 (1969). I disagree.

¶ 36. I also write to address an issue of appellate practice, namely, how an attorney should advise this court of an erroneous statement in his or her brief or oral argument.

762

## I

¶ 37. A *Chimel* search is a search incident to a lawful arrest that allows law enforcement to search the area within the arrestee's "immediate control." Law enforcement may search the area immediately surrounding the arrestee, for their protection and to preserve evidence.[1] Unless this search fits into the *Chimel* exception, it is a warrantless search and is per se unreasonable under Article I, Section 11 of the Wisconsin Constitution and the Fourth and Fourteenth Amendments of the United States Constitution.[2]

¶ 38. The only evidence of the arrestee's physical relation to the wallet was that the arrestee was on a couch in the same room as was the wallet. At the suppression hearing the officer who picked up and searched the wallet had the following to say about the wallet's location: "I think [the defendant] just nodded with his head and pointed to the area of the living room where the cedar chest was[; the wallet was under the cedar chest]." (R.15:43.) This testimony suggests only that the wallet was in the living room, nothing more.

¶ 39. That the arrestee and the evidence are in the same room is simply insufficient under our case law to validate a search incident to an arrest. Our court has

---

[1] *See Chimel v. California,* 395 U.S. 752, 763 (1969); *State v. Murdock,* 155 Wis. 2d 217, 231, 455 N.W.2d 618 (1990); 3 Wayne R. LaFave, *Search and Seizure* § 6.3(b) (4th ed. 2004).

Under *Chimel,* police may conduct a limited search of the area immediately surrounding an arrestee, " 'the area from within which [the arrestee] might gain possession of a weapon or destructible evidence.' " *State v. Murdock,* 155 Wis. 2d 217, 236, 455 N.W.2d 618 (1990) (quoting *Chimel v. California,* 395 U.S. 752, 763 (1969)).

[2] *State v. Murdock,* 155 Wis. 2d 217, 22, 455 N.W.2d 618 (1990).

stated that "[a]lthough an entire room might be an area into which an arrestee might gain access to a weapon or evidence, the *Chimel* standard authorizes a more limited scope of search which recognizes that rooms differ in size, shape and design."[3] Nothing in the record suggests the size, shape, and design of the living room. Nor does the record indicate where the officers and the defendant were in the undescribed living room. The State carries the burden of persuasion in justifying a *Chimel* search and this record is insufficient for that purpose.[4]

¶ 40. The State and the courts have struggled to find a theory to save the evidence from suppression. At the suppression hearing the State argued that the officer looked in the wallet only to confirm identity. The circuit court, in denying the motion to suppress, held that the officer picked up the wallet because he was directed to it by the defendant, or in the alternative, that the wallet was in plain view. The circuit court did not, however, find that the defendant had consented to the search.[5] The court of appeals upheld the search on grounds not argued by the parties, namely, that the search of the wallet was a reasonable search incident to a lawful arrest. The court of appeals did not cite *Chimel,* and in citing *Murdock* only once, did not do so for any proposition related to a *Chimel* search.

---

[3] *Murdock,* 155 Wis. 2d at 236. We continued in *Murdock,* in language relevant here: "Thus, [a bright-line allowance of searches of the room in which the arrest takes place], while attractively clear cut on its face, is overly broad. As such, *it is in direct conflict with the express language of Chimel,* 395 U.S. at 763 . . . ." *Id.* at 217–18.

[4] *Murdock,* 155 Wis. 2d at 222.

[5] The majority opinion acknowledges that the defendant did not consent to the search. Majority op., ¶ 21 n.6.

¶ 41. The majority opinion agrees with the court of appeals, but must overcome a hurdle the court of appeals overlooked, namely, whether the search was confined to the area permissible under *Chimel*. To overcome this difficulty, the majority opinion "infer[s]" that the officer's search was confined to the area permissible under *Chimel*. Majority op., ¶¶ 21–22. Although the State may be entitled to reasonable inferences from the evidence presented, nothing in the record allows a court to infer the size, shape, and design of the room, facts necessary to justify a *Chimel* search under this court's and the U.S. Supreme Court's jurisprudence.[6]

¶ 42. The lack of this evidence is not surprising; it is perfectly understandable. The case was not tried on the theory of a reasonable search incident to an arrest, and through no fault of law enforcement officers, no testimony about the area within the arrestee's immediate control was introduced at the suppression hearing.

¶ 43. Cognizant of the record's deficiency and the weakness of its reliance on an "inference" that the wallet was within the permissible searchable area, the majority opinion relies on what it characterizes as the defendant's "apparent concession, that law enforcement's search was confined to the area immediately surrounding" him. Majority op., ¶ 21. The majority is apparently asserting that the defendant conceded the validity of the *Chimel* search because he did not argue that the wallet was outside the searchable area, even though he contested the validity of the search. The majority opinion cites no authority for its language about concession.

---

[6] *Murdock,* 155 Wis. 2d at 217.

765

¶ 44. The defendant never made such a concession on the record or in his briefs. The court of appeals raised the question whether the search could be justified as a "protective sweep"[7] and apparently the parties argued this issue before the court of appeals. Neither the State nor the defendant argued in any court about the *Chimel* issue of the scope of the search, although the defendant argued that the search of the wallet was not permissible within the scope of a pat down.

¶ 45. The majority opinion errs. That the search did not comply with *Chimel* is plain error. The scope of the search affects substantial constitutional rights of the defendant, and this court should reach the issue and hold that the State failed to meet its burden to prove that the search was in the area within the arrestee's immediate control. A reversal of conviction is required when plain error was committed.[8] At a minimum the court should ask the parties to brief this issue, instead of relying on a non-existent concession or waiver.

¶ 46. The majority opinion has relieved the State of its burden of establishing that the evidence was within the arrestee's immediate control and that the search falls under one of the " 'jealously and carefully drawn' " exceptions to the warrant requirement. Indeed, by asserting the defendant's failure to argue a point upon which the State clearly has the burden of

---

[7] *See State v. Horngren,* 2000 WI App 177, ¶ 20, 238 Wis. 2d 347, 617 N.W.2d 508 (relating to a protective sweep in a search incident to an arrest and a caretaker search). *See* Notice of Oral Argument, Wisconsin Court of Appeals, September 29, 2003.

[8] *State v. King,* 205 Wis. 2d 81, 87–91, 555 N.W.2d 189 (1996); *State v. Sonnenberg,* 117 Wis. 2d 159, 176–77, 344 N.W.2d 95 (1984).

persuasion, the majority opinion flips the burden of persuasion from the State to the defendant.

¶ 47. Even if I were to agree with the remaining portions of the majority opinion—and I have my doubts —the record, despite the majority opinion's attempts to rectify its shortcomings, does not support the conclusion that the State has met its burden of persuasion under *Chimel*.

¶ 48. Professor LaFave writes that when reviewing *Chimel* searches, some courts view a defendant "as a combination acrobat and Houdini who might well free himself from his restraints and suddenly gain access to some distant place."[9] Here, the majority opinion has magically produced a valid *Chimel* search without a record delineating the location of the evidence in relation to the location of the arrestee. Like any illusionist's magical sleight of hand, the majority opinion is mystifying and puzzling, but ultimately not what it appears. I therefore dissent.

## II

¶ 49. I also write to address an issue of appellate practice, namely, how an attorney should advise this court of an erroneous statement in his or her brief or oral argument.

¶ 50. On November 17, 2004, five days after oral arguments in this case, the experienced Assistant Attorney General representing the State filed a motion entitled: "MOTION TO CORRECT STATEMENTS MADE DURING ORAL ARGUMENT." The State requested permission to submit a letter correcting statements made during oral arguments about an appellate decision, stating in part:

---

[9] 3 Wayne R. LaFave, *Search and Seizure* § 6.3(c) (2004).

The state is not submitting the proposed letter with this motion because the state does not want to place the additional information before the court in the above-entitled case before receiving permission from the court to do so. A draft of the letter has been prepared and it would be approximately three pages long to identify the locations of the oral argument where the incorrect statements were made, to explain the correct holding of the appellate decision and to explain how the [State's] statements were incorrect in reporting the holding of the case.

¶ 51. What was remarkable about the State's motion is that the three-page double-spaced motion conspicuously and cryptically failed to mention the name of the erroneously represented case, the name of the "appellate court" issuing the erroneously represented case, the holding of the erroneously represented case, or how essential the erroneously represented case was to the State's position. In my nearly 28 years on this court I cannot recall ever seeing a similarly worded motion. The ordinary practice is for a party's counsel to submit a letter to the court and to opposing counsel correcting any misstatement.

¶ 52. The court denied the State's request in an unpublished order dated April 22, 2005, stating: "The court appreciates the candor of the State in wanting to correct any misstatement made during oral argument. However, because the court relied on its own reading of the cases used in its decision and not on any statement made by the State during oral argument, it is not necessary to correct the representation that was made."

¶ 53. Justice Ann Walsh Bradley and I were the sole dissenters to the order. We would have granted the State's motion, given the cost and time the parties invest in preparing for cases and the importance of the adversarial system.

¶ 54. This court should care about representations made by parties. When a party that will ultimately prevail (although the State could not have known that fact when it submitted the motion) submits a motion to this court offering to correct an error, we should be receptive. We need all the help we can get.

¶ 55. The message that emerges from this court's order denying the State's motion should not be that the court does not care about what you say during oral argument. The court does care. The message for future litigants is: Do not ask permission to correct misstatements made at oral arguments or in the briefs, just do it.

¶ 56. For the reasons set forth, I write separately.

¶ 57. I am authorized to state that Justice ANN WALSH BRADLEY and Justice LOUIS B. BUTLER, JR. join this separate dissenting opinion.