**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 13, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1155**

Cir. Ct. No. 2018JV121

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE INTEREST OF D.R.C., A PERSON UNDER THE AGE OF 17:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

D.R.C.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Waukesha County: LLOYD V. CARTER, Judge. *Affirmed*.

¶1     NEUBAUER, C.J.[1]  D.R.C. appeals from a dispositional order finding him delinquent for operating a motor vehicle without the owner's consent, and he challenges the denial of his motion to suppress statements he made to police.[2]  D.R.C. was stopped and questioned by police after he fled the scene of a car accident.  We conclude that when D.R.C. made the statements, he was not in custody requiring **Miranda** warnings, but was instead subject to an investigatory stop while the police investigated a serious car crash.[3]  We therefore affirm.

## BACKGROUND

¶2     Officer Bryce Scholten was the only witness to testify at the hearing on D.R.C.'s motion to suppress, and the following facts are taken from that testimony.  Scholten wore an activated body camera throughout this incident, and the video was introduced as an exhibit at the suppression hearing, which the circuit court viewed.  It was not, however, made a part of the appellate record.

¶3     On April 20, 2018, Waukesha dispatched multiple officers to a car crash, including Scholten. Dispatch described a vehicle striking a tree and occupants fleeing from the scene.

¶4     Scholten received information that the fleeing individuals included two white males appearing to be in their teens or early 20s, with one wearing a

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

[2]  Because he is a juvenile, we refer to the appellant-defendant by his initials, D.R.C.  *See* WIS. STAT. RULE 809.19(1)(g).

[3]  **Miranda v. Arizona**, 384 U.S. 436, 444 (1966) (per the Fifth Amendment of the United States Constitution, no person should face custodial interrogation until his or her constitutional rights are explained, e.g., right to remain silent, right to attorney, etc.).

black track suit. Because he was not the first officer to the scene, Scholten passed by the accident and began looking for the two males or injured persons, shining a spotlight to illuminate the sides of the roadway.

¶5 After about seven minutes, Scholten noticed a male wearing a "running type" black jacket with white stripes going down the sleeves. Scholten put his spotlight on him because it was dark. It was sixteen-year-old D.R.C. Scholten believed that he recognized him from a previous encounter, but no arrest had resulted.

¶6 As Scholten approached on foot, he saw what he thought was the handle of a handgun in D.R.C.'s waistband. Scholten "immediately directed him to the ground, and [Scholten] handcuffed him." D.R.C. explained that it was a $CO_2$ gun, which Scholten then confirmed. Scholten emphasized to D.R.C. that he could have shot him had he reached for his waistband. After patting him down, Scholten also uncovered a pocket knife, or possibly two. Scholten then assisted D.R.C. to his feet.

¶7 Scholten learned that D.R.C. had recently turned sixteen and did not yet have his driver's license. D.R.C. asked to speak with his father, but Scholten told him he could not right then. Scholten believed D.R.C. may have been on his cell phone speaking with his father when he first approached him.

¶8 About that time, Officer Luling arrived, and Scholten moved D.R.C., still in cuffs, to the curb. Scholten asked whether D.R.C. needed medical attention, about the crash, other injuries, and the identity of passengers. Scholten testified that he wanted to make sure that the individual in the crash was safe due to the high level of damage he saw to the car.

¶9     D.R.C. said he had been in the crash and gave the first name of the other occupant. He told the officer that the other person was the driver, and he did not know his last name. D.R.C. also stated that the car belonged to one of their acquaintances, a girl named K.K.[4]

¶10    Scholten and Luling then stood D.R.C. up and told him twice that he was not under arrest, and they would be removing his handcuffs. When D.R.C. asked where he should put his hands, Scholten told him to put them on top of his head. D.R.C. asked if he could move his foot.

¶11    Scholten testified that they were not letting him go at that point and whether they would depended on further investigation. When asked at the hearing if D.R.C. was free to leave after his handcuffs were removed, Scholten responded that he was not, because Scholten needed D.R.C.'s assistance, as a crash had occurred, one occupant was still missing, and D.R.C.'s involvement with the crash was unclear.

¶12    At some point, a third officer arrived near the curb, as part of the team of officers investigating the crash. Scholten testified that, as the activities of the investigation ensued, "we always had someone standing by" D.R.C.

¶13    While D.R.C. was again seated on the curb, the officers asked questions related to who the boys were with that night and who owned the car. Scholten received additional information from the officer at the crash scene, including that an eye witness reported to police that the driver of the car wore a track suit. Scholten believed D.R.C. was not being truthful about who was

---

[4] Because she is a juvenile, we refer to her initials, K.K. *See* WIS. STAT. RULE 809.19.

driving. Scholten "confronted [D.R.C.] about this" and told him that he thought he was lying. Scholten recalled saying, "[D]on't get yourself in a deeper hole, be honest."

¶14 Scholten learned the windshield damage indicated that the passenger was not wearing a seat belt, and the driver's side air bag deployed. Scholten also asked to see if D.R.C. had a seat belt mark on his chest to indicate whether he was the passenger or the driver, being within arm's reach when asking these questions. Scholten was frustrated because it was a dynamic situation and he believed D.R.C. was lying. He testified he did not yell, but "was being stern with him" and told D.R.C. not to lie. Scholten told D.R.C. that if he did lie, he "would push him further down the rabbit hole."

¶15 D.R.C. then acknowledged that he had been the driver. It had been about fifteen to twenty minutes since he sat down on the curb. D.R.C.'s father arrived at around this time. One of the other officers spoke to him, and the father parked several hundred feet away. D.R.C.'s father was not allowed to sit with him and was required to stay near his truck. Scholten stated that at this point he was still investigating whether D.R.C. had permission to drive the vehicle.

¶16 Through phone calls, Scholten learned that K.K. stated she told D.R.C. he did not have permission to take the vehicle. After confronting D.R.C. with this information, D.R.C. acknowledged that K.K. did tell him not to drive the car. Scholten placed D.R.C. under arrest.

¶17 Scholten handcuffed D.R.C., put him in the back of his squad car, and took him to an interview room at the Waukesha Police Department. There, Scholten read D.R.C. his *Miranda* warnings for the first time. D.R.C. requested a lawyer.

¶18  On June 11, 2018, the State filed a delinquency petition charging D.R.C. with one count of operating a motor vehicle without the owner's consent in violation of WIS. STAT. § 943.23(3).  D.R.C. moved to suppress his statements generally on the ground that he was subject to custodial interrogation without having received his *Miranda* warnings.  After testimony and arguments from counsel, the circuit court denied the motion.  The court discussed at length the nature of what the court described as the "cooperative" interactions between Scholten, the other officers, and D.R.C., making extensive and thorough findings of fact.  The court summed up its view as follows:

> But ultimately from this Court's evaluation of the totality of the circumstances, the Court does believe that the State has established by a preponderance of the evidence that this is not and was not a custodial interrogation situation requiring *Miranda* warnings.

¶19  D.R.C. entered a plea to the charge of operating a motor vehicle without the owner's consent as party to a crime.  D.R.C. appeals.

## DISCUSSION

¶20  When we review a circuit court's decision on a motion to suppress evidence, we apply a two-step standard.  *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.  Unless the circuit court's factual findings are clearly erroneous, we will uphold them.  *Id.*  We independently review, however, whether those facts violate constitutional principles.  *Id.*

¶21  The issue is whether D.R.C. was in custody prior to his formal arrest, such that he should have been given *Miranda* warnings.  *See State v. Mitchell*, 167 Wis. 2d 672, 686, 482 N.W.2d 364 (1992).  The *Miranda* warnings are required because "[t]he circumstances surrounding in-custody interrogation

6

can operate very quickly to overbear the will of [the suspect]." ***State v. Miranda***, 384 U.S. 436, 469 (1966). "The process of in[-]custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel [the individual] to speak where [the individual] would not otherwise do so freely." ***Id.*** at 467.[5]

¶22     Here, the State concedes that the officer interrogated D.R.C. prior to his arrest. The only disputed issue is whether the investigatory stop evolved into a formal arrest for purposes of the Fifth Amendment, i.e., custody, at the time, such that the circuit court erred in denying the motion to suppress. The State bears the burden to establish by a preponderance of the evidence that the stop did not become custodial. *See **State v. Armstrong***, 223 Wis. 2d 331, 351, 588 N.W.2d 606 (1999).

¶23     Considering the totality of the circumstances, we conclude that the questions and conduct of the officers were part of an investigatory ***Terry***[6] stop, as opposed to a custodial arrest of D.R.C. The police were still investigating what happened in the crash—was anyone hurt, and if so, to what degree, who owned the car, who drove it, and did the driver have permission. A reasonable person in D.R.C.'s position would not have believed himself or herself to be in custody at the time incriminating statements were made to the officers, given the degree of restraint under the circumstances.

---

[5] The Fifth Amendment of the United States Constitution states that "[no person] shall be compelled in any criminal case to be a witness against himself." The Wisconsin Supreme Court has interpreted article I, section 8(1) of the Wisconsin Constitution consistent with the United States Supreme Court's interpretation of the Fifth Amendment. ***State v. Ward***, 2009 WI 60, ¶18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

[6] ***Terry v. Ohio***, 392 U.S. 1 (1968).

7

¶24 For constitutional purposes, we recognize two types of seizures: an investigatory or *Terry* stop and an arrest.[7] *State v. Young*, 2006 WI 98, ¶¶20, 22, 294 Wis. 2d 1, 717 N.W.2d 729; *see also* WIS. STAT. § 968.24 (codification of *Terry* standard).

¶25 An investigatory *Terry* stop involving brief questioning is a minor infringement on personal liberty and is constitutional under the Fourth Amendment if supported by reasonable suspicion that a crime has been committed or is being committed. *Young*, 294 Wis. 2d 1, ¶20. "Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." *Id.*, ¶21.

¶26 On the other hand, a formal arrest for purposes of the Fifth Amendment, and requiring *Miranda* warnings, "is a more permanent detention that typically leads to 'a trip to the station house and prosecution for crime,'" and requires probable cause to suspect that a crime has been committed. *Young*, 294 Wis. 2d 1, ¶22 (citation omitted). Whether a person has been arrested by questioning turns on whether a "reasonable person in the defendant's position would have considered himself or herself to be 'in custody,' given the degree of restraint under the circumstances." *State v. Swanson*, 164 Wis. 2d 437, 447, 475 N.W.2d 148 (1991), *overruled on other grounds by State v. Sykes*, 2005 WI 48, ¶27, 279 Wis. 2d 742, 695 N.W.2d 277. In order to make that determination, a court will look at the totality of the circumstances. *State v. Lonkoski*, 2013 WI

---

[7] The Fourth Amendment of the United States Constitution and the Wisconsin Constitution protect the right to be free from unreasonable searches and seizures, and the provisions are generally construed in the same way. U.S. CONST. amend. IV; WIS. CONST. art. I, § 11; *see also State v. Kramer*, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598; *State v. Young*, 2006 WI 98, ¶30, 294 Wis. 2d 1, 717 N.W.2d 729.

30, ¶28, 346 Wis. 2d 523, 828 N.W.2d 552. The totality of the circumstances includes relevant factors such as the defendant's freedom to leave; the purpose, place and length of the interrogation; and the degree of restraint. *See State v. Gruen*, 218 Wis. 2d 581, 594-96, 582 N.W.2d 728 (Ct. App. 1998).

¶27    Notably, pursuant to a *Terry* stop, an officer may diligently elicit information to determine the suspect's identity and obtain information to confirm or dispel the officer's suspicions quickly, *during which time it is necessary to detain the suspect.  Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). As D.R.C. acknowledges, a *Terry* seizure under the Fourth Amendment is not synonymous with custody under the Fifth Amendment. *Berkemer*, 468 U.S. at 440 (rejecting argument that in every traffic stop a person is in custody). Thus, the inability to leave is "not the determinative consideration," *Gruen*, 218 Wis. 2d at 593, but, a factor of what is the "ultimate" question, whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Lonkoski*, 346 Wis. 2d 523, ¶6 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). In other words, the objective circumstances must be the functional equivalent of a formal arrest.

¶28    In evaluating the degree of restraint, courts have considered as relevant factors:  (1) was defendant handcuffed, (2) was a gun drawn, (3) was a *Terry* frisk performed, (4) in what manner was the defendant restrained, (5) was the defendant moved, (6) did the questioning occur in a police vehicle, and (7) how many police officers were involved. *Gruen*, 218 Wis. 2d at 594-96 (see case for authorities on each of these factors).

¶29    Here, the purpose of Scholten and the other officers was plainly an investigation into a serious crash with (1) potential injuries to the fleeing

occupants and (2) suspected criminal activity, i.e., fleeing the scene by the occupants. Neither party suggests that Scholten should not have initially approached D.R.C. on foot, or even that it was a seizure at that point: D.R.C. was in the vicinity, matched the age description, and wore the reported black track jacket.

¶30 Upon seeing what looked like a handgun on the young man, the officer reasonably ordered D.R.C. to the ground, handcuffing him and frisking him, and then learned that the gun was a $CO_2$ gun, while also finding a knife.

¶31 At this point, another officer arrived, and they moved D.R.C. to the curb. During the initial questions, D.R.C. identified himself, and Scholten learned that D.R.C. had just turned sixteen and did not have his license. Scholten confirmed that D.R.C. had been in the car (and obviously, had fled), and D.R.C. identified the other occupant and advised that the owner, K.K., was not an occupant. The officers then removed the handcuffs, but asked D.R.C. to keep his hands above his head, which was reasonable to ensure officer safety in light of the $CO_2$ gun and knife found. They told D.R.C. twice that he was not under arrest.[8]

¶32 The questions put to D.R.C. related to how the accident happened, was anyone injured, who was involved, who was the owner, who was driving, and who were the occupants. These are all touchstone inquiries to help police

---

[8] D.R.C. points to Scholten's testimony that he believed D.R.C. was not free to leave, but acknowledges that this was never communicated to D.R.C. As noted, D.R.C. was not free to leave. In any event, Scholten's subjective intent, absent manifestation through actions and words, is not relevant to whether a custodial arrest occurred because we use an objective standard. *See State v. Williams*, 2002 WI 94, ¶4, 255 Wis. 2d 1, 646 N.W.2d 834 (we apply an objective reasonable person test to determine whether a seizure has occurred based on the officer's words and actions under the totality of circumstances).

understand what happened at an accident scene when the occupants had fled. Importantly, the officers needed to determine whether there were people in need of help. As the circuit court noted, the identity and whereabouts of the other person was unknown. The initial information was that this was a "significant" accident. As time went on, the officer learned that the passenger's head may have hit the windshield hard and the driver's air bags were deployed—the individual may have been "substantially injured."

¶33 Significantly, the circumstances also supported reasonable suspicion that criminal activity was afoot—why did the occupants flee the scene of a serious accident? Was there underage driving, a potentially stolen car, driving without the owner's permission? What caused the one-car accident, and were drugs or alcohol involved?

¶34 At the time D.R.C. admitted that he was the driver and did not have the owner's permission, the restraint imposed on D.R.C. was minimal. *See Gruen*, 218 Wis. 2d at 594-96. D.R.C. was no longer cuffed; the police never drew weapons; he was asked to sit on a roadside curb, in public, with other activity going on about him; he had been told multiple times that he was not under arrest; he was not moved to another location until after his arrest; the questioning did not occur in a police vehicle; and although another officer or two may have asked him a question, Scholten almost exclusively asked the questions.

¶35 D.R.C. argues he was in custody because (1) during the initial encounter he was handcuffed on the ground, (2) Scholten's subsequent questioning became accusatory, (3) D.R.C. was a juvenile, and his father was not permitted to join him towards the end of the questioning, and (4) the stop lasted too long.

¶36    D.R.C. fails to acknowledge that the circuit court, after reviewing the video, made extensive findings. Because the video is not in the appellate record, we cannot review it and, instead, must assume that it supports the circuit court's ruling. *See Schaidler v. Mercy Med. Ctr. of Oshkosh, Inc.*, 209 Wis. 2d 457, 469-70, 563 N.W.2d 554 (Ct. App. 1997) ("It is the appellant's responsibility to insure that the record includes all documents pertinent to the appeal."); *see also T.W.S., Inc. v. Nelson*, 150 Wis. 2d 251, 254-55, 440 N.W.2d 833 (Ct. App. 1989) (when presented with only a partial record on appeal, we are necessarily confined in our review and will assume that "every fact essential to sustain the trial court's decision is supported by the record").

¶37    As regards the initial encounter, the court found that even the *Terry* frisk was "a cooperative interaction." The court found D.R.C. did not resist and was apologetic. The court concluded that the officer's statement that D.R.C. could have been shot was not a threat, but was along the lines of "adult advice," and in any event, the interaction was "resolved quickly." The "tenor … changed significantly and immediately, and the subsequent interaction[s with the officers] appeared to be conversational throughout."

¶38    The court found the officers told D.R.C. two times that he was not under arrest. The officer brought D.R.C. to the curb and removed the handcuffs. The court found that the officers were largely "milling around," not "looming over" D.R.C., while Scholten was on the phone—in a lengthy conversation aimed to identify the car's owner. The court found that the ensuing encounter was "calm, cooperative, [and] without raised voices." The court found the officer's contentions that D.R.C. was not being honest were "stern," but nonthreatening and contained no coercive tactics.

¶39 The court found that all the officers maintained a reasonable distance between D.R.C. and themselves when asking questions, especially in consideration of officer safety and normal communication between individuals. We have no basis to conclude that the court's extensive findings of fact are clearly erroneous.

¶40 As regards D.R.C.'s contention that the analysis favors suppression because he was a juvenile, we fail to see how this changes our analysis or conclusion under the totality of circumstances. Rather, D.R.C., having turned sixteen, was presumably on his way to obtaining his own license, was carrying a knife and a $CO_2$ gun with an authentic looking handle requiring the officer to force him to the ground, and Scholten recalls at least one other time speaking with D.R.C. The officer was undoubtedly interested in continuing the investigation quickly and uninterrupted by D.R.C.'s request to call his father, and later, his father's arrival, particularly given that there was a pressing need to identify and locate the other occupant. Notably, the circuit court found that there was no indication in the record that D.R.C. was below average intelligence, concluding that he appeared to be "more mature than one might expect from a lot of 16 year olds who interact with police in the way he spoke with the officer." Again, we have no basis to determine that the circuit court's findings were clearly erroneous.

¶41 Lastly, as to the length of the encounter, a little over an hour, as the court emphasized, after the *Terry* frisk, the officer's "significant focus" at the outset was "what certainty could reasonably be considered a potential medical emergency"—the other unidentified young man who left the scene. That continued when the officer learned that the passenger had hit his head hard enough to crack the windshield and the driver's side air bag deployed. After the officer made lengthy calls, he learned that permission to drive was also an issue. Given

13

the shifting information, the court not only concluded that the temporary *Terry* stop was noncoercive, it was conducted diligently under the circumstances as the officers quickly sought to confirm or dispel their suspicions. In sum, although the total stop was longer, Scholten diligently gathered other information through dispatch and phone calls during this time, and the period during which questions were asked of D.R.C. when he was sitting on the curb lasted about fifteen minutes.

¶42 In sum, the Fifth Amendment does not prohibit the police from asking questions during a *Terry* stop, even though the suspect is not free to leave during the temporary detention. What the Fifth Amendment does prohibit is the use of practices or tactics that compel a person to incriminate himself or herself: tactics which create a coercive custodial environment that is the functional equivalent of a formal arrest in which "the behavior of … law enforcement officials was such as to overbear [the individual's] will to resist and bring about confessions not freely self-determined." *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (citation omitted); *see Miranda*, 384 U.S. at 457-58. Here, under the totality of circumstances, we affirm the circuit court's determination that D.R.C. was not in custody for *Miranda* purposes at the time he admitted driving the vehicle and driving it without permission.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.